THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. STAUNTON LANDFILL, INC., *et al.*, Defendants-Appellees.

Fourth District   No. 4—92—0663

Argued March 17, 1993.—Opinion filed June 3, 1993.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, of Chicago, and James L. Morgan, Assistant Attorney General (argued), of Springfield, of counsel), for the People.

Thomas J. Immel (argued), of Alton, for appellees.

JUSTICE LUND delivered the opinion of the court:

The office of the Attorney General of the State of Illinois (State) appeals the denial of its motion for preliminary injunction seeking to enjoin Staunton Landfill, Inc. (SLI), from accepting wastes in its landfill site until SLI complies with a number of provisions of the Illinois Environmental Protection Act (Act) (Ill. Rev. Stat. 1991, ch. 111½, pars. 1001 through 1056.6). After a full hearing, the trial court issued an order finding many of the State's allegations unfounded. The order also reflected an agreement among the parties that, without any admission of liability, SLI would be enjoined to cease and desist from violations of specific sections of the Act. The State appeals the trial court's finding that allegations of the violations were unfounded and asks that an injunction be issued to preliminarily enjoin SLI from further violations of the Act. We affirm.

Defendant SLI, a Missouri corporation authorized to do business in Illinois, operates a landfill in Macoupin County, Illinois. The landfill was formerly owned by Charles Westhoff, who sold the facility on contract to SLI on July 26, 1990. According to the terms of the contract, SLI would operate the landfill in his stead until the Illinois Environmental Protection Agency (IEPA) transferred the operating permit to SLI. In December 1991, SLI came under new ownership and management. Thomas Immel, the attorney of record for defendant on appeal, became the president of SLI at this time.

At the time Immel took control of SLI, there was an ongoing permit appeal between the IEPA and the former owners of SLI. The original permit issued in 1974 had specified a limitation on the final height of the landfill at the time of closure. When SLI began operating the landfill, it was notified that certain unused sections of the landfill exceeded the permitted elevation. The former owners of SLI proposed to the IEPA, in SLI's closure plan, that this height violation be allowed to remain in place and, in exchange, SLI would reduce the use of other permitted areas. The IEPA rejected this closure plan on November 7, 1990. SLI submitted another closure plan in February 1991, and this was denied a few months later.

When Immel took control of SLI in December 1991, it was decided to abandon any attempt to modify the original permit. Instead, SLI began shaving off wastes from the area in violation of the height restriction in order to bring the elevation down to the permitted level. The "skimmed off" waste was moved to areas of the landfill which were not over the final elevation limits, and the area that had been skimmed off received a new cover. The project took a couple months to complete and was finished on May 11, 1992.

On February 4, 1992, the State filed a complaint in response to a number of alleged violations of the Act. The complaint called on the trial court to (1) enter a preliminary injunction enjoining defendants from continuing to accept wastes at the landfill; (2) enter a permanent injunction enjoining defendants from violating sections 9.1 and 21 of the Act (Ill. Rev. Stat. 1991, ch. 111½, pars. 1009.1, 1021); (3) find that defendants had repeatedly and knowingly violated these sections of the Act; and (4) impose civil penalties of $10,000 for each initial violation that occurred prior to July 1, 1990, plus $1,000 per day for each day that the violation was allowed to occur. For those violations occurring after July 1, 1990, the State asked for a penalty of $50,000, plus $10,000 for each day the violations were allowed to continue. In addition, the State requested defendants be ordered to pay plaintiff's costs, attorney fees, and the cost of expert witnesses and consultants.

On April 6, 1992, the State filed a motion for a preliminary injunction, alleging the same violations of the Act as in the original complaint and calling for the closure of the landfill until the alleged violations ceased. The motion was filed in conjunction with the original complaint, and the hearing on this motion forms the basis of this appeal. The status of the original complaint is unknown and presumed to be pending.

The alleged violations can be grouped under four general claims for relief. The first claim alleged that SLI failed to meet requirements imposed on landfill sites that accept waste material containing asbestos. Section 9.1(d)(1) of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1009.1(d)(1)) incorporates the standards adopted by the United States Environmental Protection Agency governing disposal of asbestos waste. The complaint alleged a violation of section 61.154(b) of the Code of Federal Regulations (Code) (40 C.F.R. §61.154(b) (1991) (as amended eff. November 20, 1990)), adopted pursuant to section 112 of the Clean Air Act (see 42 U.S.C. §7412 (1988)). Section 61.154(b) of the Code provides:

"Unless a natural barrier adequately deters access by the general public, either warning signs and fencing must be installed and maintained as follows, or the requirements of paragraph (c)(1) of this section must be met." (40 C.F.R. §61.154(b) (1991).)

Section 61.154(c)(1) of the Code provides in relevant part:

"[A]t the end of each operating day, or at least once every 24-hour period while the site is in continuous operation, the asbestos-containing waste material that has been deposited at the site during the operating day or previous 24-hour period shall:

(1) Be covered with at least 15 centimeters (6 inches) of compacted nonasbestos-containing material." (40 C.F.R. §61.154(c)(1) (1991).)

The trial court found that SLI was currently meeting the daily-cover requirement of subsection (c)(1) of the Code and was therefore not required to have either a natural barrier, fencing, or warning signs around the perimeter of the landfill site.

Another alleged violation under section 61.154 of the Code was SLI's failure to maintain records of asbestos waste deposited in its landfill. Such records are required to contain, among other things, the identity of the waste generator, quantity of waste, and its location in the landfill, and must be furnished on request and made available during normal business hours. (40 C.F.R. §§61.154(e), (f), (i) (1991).) The issue of SLI's violation of this regulation was ultimately settled by

agreement between the parties. This agreement, incorporated in the court's order, states that without any finding or admission of liability, SLI would be enjoined to take all necessary actions to collect and maintain the required records of asbestos waste shipments.

The second claim for relief alleged that SLI violated section 21(d)(2) of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1021(d)(2)), which prohibits the violation of any regulation or standard adopted by the Illinois Pollution Control Board (IPCB). Specifically, the complaint alleges a violation of section 807.305 of title 35 of the Illinois Administrative Code (Administrative Code) (35 Ill. Adm. Code §807.305 (1991)), which requires that daily cover (consisting of a compacted layer of six inches of suitable material) be placed on all exposed refuse at the end of each day of operation. As stated earlier, the trial court found no daily-cover violations under the Clean Air Act. The same conclusion applied to daily-cover violations under the Administrative Code.

The third claim for relief was also brought pursuant to section 21(d)(2) of the Act, alleging a violation of IPCB regulations 807.503 and 807.523 (35 Ill. Adm. Code §§807.503, 807.523 (1991)), which provide that an operator of a waste-management site shall have prepared a written closure plan and a written post-closure plan as a condition of the site permit. SLI purchased the landfill in July 1990. The first closure plan was denied November 7, 1990. Another closure plan was filed in February 1991 and rejected that same year. Immel took over SLI in December 1991, and a closure plan was filed in April 1992.

Although permit applications normally take 75 to 85 days to review, the Attorney General requested the IEPA to put a rush on the most recent application. SLI first learned the permit application had been denied when the State entered the denial letter into evidence while presenting its case at the hearing. Testimony revealed that many of the perceived problems with the closure plan were the result of minor technicalities or misunderstandings. Although it is typical for the IEPA to contact the applicant in order to clear up any problems which may arise during the application process, no attempt was made to communicate with SLI regarding perceived deficiencies in its permit application. A copy of the denial was finally sent to SLI five days after the hearing began.

The trial court found the lack of a closure, post-closure plan was primarily due to a lack of communication between the parties. It ordered IEPA to conduct a review of the latest plan and work out whatever difficulties were found with the defendant SLI. Two versions of

a closure plan were later submitted. After argument, the trial court chose one version and ordered IEPA to issue the permit.

The fourth and final claim for relief was also brought under section 21 of the Act, alleging a violation of IPCB regulation 807.302 (35 Ill. Adm. Code §807.302 (1991)), which requires a landfill site operator to comply with all conditions and provisions of its permit. Specifically, the State alleged SLI operated the landfill in violation of final-height limitations required in its permit. The trial court found that as a result of the shaving-off of one section of the landfill, SLI was not currently in violation of this regulation. Testimony at the hearing established that the original height violation was created by prior owners of the landfill.

On appeal, the State alleges three violations, under the general headings of sections 21(d)(2) and 9.1(d)(1) of the Act, and claims the court erred in concluding defendants were not in violation of these sections. As mentioned earlier, section 21(d)(2) of the Act prohibits violations of IPCB regulations and section 9.1(d)(1) of the Act incorporates the standards adopted by the United States Environmental Protection Agency governing disposal of asbestos waste. The specific violations alleged are derived from (1) section 807.305 of the Administrative Code, which requires daily cover of all exposed refuse at the end of each day of operation; (2) sections 61.154(b)(1) and (b)(2) of the Code (40 C.F.R. §§61.154(b)(1), (b)(2) (1991)), which require that a landfill accepting asbestos waste and, *not meeting the requirement of daily cover,* must have fencing installed along the perimeter of the landfill and warning signs posted; and (3) section 61.154(i) of the Code (40 C.F.R. §61.154(i) (1991)), which requires that records of the location and quantity of asbestos waste at the site be furnished upon request and made available during normal business hours for inspection.

## DAILY COVER

The State's first witness, Steven Youngblut, is a district engineer in the air pollution division of the IEPA. His first inspection occurred on December 14, 1990, at which time he observed uncovered waste. He had no idea whether it was covered later in the day. Under questioning by the trial judge, he admitted that no action was taken as a result of this inspection. He inspected the site again on May 11, 1992, and found no evidence of uncovered waste. He commented that the site as a whole looked better.

The State's second witness, Steve Townsend, is a field inspector for the IEPA, division of land pollution control. On two different inspections, March 16, 1992, and April 17, 1992, he observed inadequate

cover on an area of the central portion of the south hill. This is the unused portion of the landfill where SLI had engaged in its "skimming" operation to lower its elevation. Townsend returned on May 26, 1992, and found the skimming operation complete, a new "cap" on this unused portion, and vegetation planted and growing on it. His inspection on this day came about as a result of a complaint from an unidentified politician. The complaint was determined to be entirely unfounded. He has seen no visible emissions of asbestos at the site and received no official complaints from the public.

The State's third witness, Richard Johnson, is the assistant regional manager for the IEPA, division of land pollution control. He testified that he inspected the landfill on August 30, 1990, and again on December 14, 1990. On both occasions, he found areas of the landfill that contained uncovered waste. The August 30, 1990, inspection took place at 10:30 a.m. and, from what he could observe, the landfill had not begun accepting waste that day. The December 14, 1990, inspection took place at about 2 p.m. and uncovered waste was observed in areas other than the active operating face. He had no idea whether daily cover had been put over the violating areas between August 30 and December 14, 1990, nor could he say for certain if the uncovered debris found in August was the same as the uncovered debris found in December.

Over a year passed before he inspected the site again. On January 6, 1992, he found uncovered waste at the site and, on his next inspection on March 16, 1992, he observed uncovered waste in that same area where he had found uncovered waste two months earlier. In its brief, the State claims Johnson testified that the uncovered waste observed in January was still uncovered in March and remained uncovered through the time of the April 17, 1992, inspection. A careful review of the record reveals that during cross-examination Johnson specifically stated that the uncovered refuse seen in January had been covered by the time of his March 16, 1992, inspection. At no time does Johnson state that the uncovered waste seen on his April 17, 1992, inspection was the *same waste* as he had seen uncovered on the prior two inspections.

During his March 16, 1992, inspection, he found a different area of uncovered waste where a trench had been dug along the side of the landfill. According to Immel's testimony, the trench had been dug that morning, filled with concrete columns, and filled in again on the same day. The uncovered waste Johnson observed on April 17, 1992, was apparently located in the area where SLI was engaged in the skimming operation to lower the elevation of an unused portion of the

landfill. This height violation was created by prior owners of the landfill, not SLI. Immel's testimony indicated great care was taken to reduce any dust emissions caused by this skimming procedure and daily cover was applied throughout the project.

Johnson's final inspection was on May 11, 1992. He found no cover violations. At no point was Johnson able to state that waste material deposited on one day was left uncovered until the next day.

■ The State cites *Environmental Protection Agency v. Penn* (1977), 27 Ill. PCB Op. 217, for the principle that violations can be proved by either visiting the site at the end of the day's operation and finding the requisite cover was not applied or by visiting the site on two different days and finding the same refuse uncovered. Under this standard, the trial court's ruling that there was insufficient evidence of a daily cover violation appears to be well supported by testimony. The inspections all took place in the morning or afternoon during operating hours at the landfill. Johnson testified that he saw uncovered waste on two morning inspections (7 a.m. and 10:30 a.m.), where it appeared to him that the landfill had not begun accepting waste for the day. However, no conclusive evidence was presented that waste was ever allowed to go uncovered at the end of any working day.

■ The State's allegation of a violation of sections 61.154(b)(1) and (b)(2) of the Code, requiring fencing and warning signs, is entirely dependent upon the daily-cover violation. The trial court's finding that there has been no violation of cover regulations eliminates any need to discuss SLI's failure to install fencing or warning signs.

## ASBESTOS RECORDS

Pursuant to section 9.1(d)(1) of the Act, SLI is required to comply with section 61.154(i) of the Code (40 C.F.R. §61.154(i) (1991) (as amended effective November 20, 1990)), adopted pursuant to section 112 of the Clean Air Act (see 42 U.S.C. §7412 (1988)). This section provides that the owner or operator of a waste disposal site that accepts asbestos-containing waste material shall "[f]urnish upon request, and make available during normal business hours for inspection by the Administrator, all records required under this section." (40 C.F.R. §61.154(i) (1991).) Although not explicitly required in the regulation, the IEPA interprets this section to mean that the records must be kept at the landfill site.

On December 14, 1990, Youngblut went to the landfill site and asked to see the records of asbestos disposal. He spoke with an employee of the landfill who provided him with forms which appeared to be shipment manifests for asbestos. The records were not in compli-

ance with IEPA standards, and the employee was unable to provide the required map showing the location of asbestos waste within the landfill. No effort was made to contact the owner of the site, nor was there any further effort to check the contents of these records. Immel was unable to rebut this testimony because he had no connection with SLI at the time. Cross-examination focused on the fact that no action was taken as a result of this violation.

Youngblut's next inspection was on May 11, 1992. Prior to this date, on May 5, 1992, Immel removed the asbestos records from the landfill site and moved them to the corporate office in Alton, Illinois. Until that time, the records had been stored in an old trailer that SLI had inherited from the previous owners. Some of SLI's equipment had been vandalized and Immel did not feel the records were secure. Arrangements had already been made to get a larger, more secure trailer, locked cabinets, security lighting, and guard dogs. The records were returned to the landfill site on May 20, 1992.

When Youngblut asked to see the records of asbestos disposal on May 11, 1992, he was told by an equipment operator that the records were at the office in Alton, Illinois. Youngblut made no attempt to contact the Alton office. Later that day, Immel learned that Youngblut had asked about the asbestos records. He immediately called Youngblut's office to arrange a meeting to go over these records. Youngblut was not in, and he never returned the call.

The trial judge felt this issue could best be resolved if the parties made an effort to communicate with each other:

"I've got a bad taste in my mouth about this case. And a lot of technicalities and all these photographs that I've had a chance to see from the beginning to now, indicate to the Court that the operator, Staunton Landfill, Inc.[,] at this time has done a lot to improve the site. And for some reason he's not getting the usual cooperation the [IEPA] gives to other people in getting this permit either in line with what they want, and I think he's trying to cooperate."

On July 6, 1992, the State went to the landfill to check the asbestos records. Certain deficiencies in these records were noted but, by the time of the next hearing date on July 23, 1992, these deficiencies were substantially corrected. The State proposed working out an agreed order reflecting an assurance that the record keeping would be brought into compliance with the Act. This agreed order was incorporated into the court's judgment, which reads, in relevant part:

"IT IS THEREFORE ORDERED that the Plaintiff's Motion is denied, provided however that by agreement of the parties

and without any finding or admission of liability, Defendant Staunton Landfill, Inc., is hereby enjoined to a) cease and desist from violations of subsection 9.1(d) of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1991, Ch. 111½, par. 1009.1(d) and 40 C.F.R. 61.154(f) and (b) take such action as is necessary to collect and maintain the information required by 40 C.F.R. 61.154(f) as to past shipments of asbestos-contaminated construction debris."

The court's order provided, by agreement of the parties, a provision enjoining SLI from violations of section 61.154(f) of the Code (40 C.F.R. §61.154(f) (1991)), which required that a landfill operator accepting asbestos waste maintain, until closure, records of the location, depth and area, and quantity of asbestos-waste material within the disposal site. The State now contends that the trial court erred in failing to enjoin SLI from violating sections 61.154(e) and (i) of the Code (40 C.F.R. §§61.154(e), (i) (1991)), which provide for the specific information to be included within the asbestos records and that the records be made available during normal business hours.

■ The trial court's order reflects the fact that at the hearing held on July 23, 1992, the State was substantially satisfied with the present state of SLI's asbestos records. The State proposed the idea of an agreed order covering the "record-keeping matters" and made no objection to the court's incorporation of this agreement into its judgment. To complain now that the court's injunction is no longer agreeable to the State is consistent with the disingenuous spirit that runs through much of this case. A party may not complain of an error in an action which he induced the court to take. *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 475 N.E.2d 817.

According to the trial court's order, SLI was enjoined from violating daily-cover requirements under section 9.1(d)(1) of the Act, which referred only to the disposal of asbestos waste. The State now argues, inexplicably, that the court erred when it failed to enjoin SLI from violating section 9.1(d)(1) of the Act. Not only had this injunction been granted, but this provision was included as a result of an agreement among the parties.

■ No injunction was issued under section 21(d)(2) of the Act, which incorporates the requirements under section 807.305 of title 35 of the Administrative Code, requiring daily cover on *all* exposed refuse. The State contends the trial court's finding that there were no daily-cover violations is against the manifest weight of the evidence. Furthermore, the State contends that the threat to the environment and public health posed by violations of the Act is not alleviated by

subsequent compliance with those same standards. Injunctive relief, the State argues, should turn solely upon whether violations have occurred, not whether the violations are presently occurring.

The issue is of particular importance because the trial judge repeatedly emphasized that he was primarily concerned with the current condition and operation of the landfill site. The trial judge stated:

"Also I don't feel there's been anything [to establish] a violation of daily cover. And when I say this, I'm primarily concerned about whether or not these problems exist now.

* * *

This is when the injunction, if it takes effect, will take effect. So I'm concerned about the situation at the site now. I don't believe there is a height problem that exists now, based upon what evidence has been presented, nor do I believe there is a daily cover problem now. So as far as those issues are concerned, I'm going to resolve those in favor of the Defendants."

The trial court heard overwhelming evidence that the condition of the site had markedly improved since Immel took SLI over in December 1991. The evidence included photographs showing the present condition of the site. Ample testimony indicated that the site is in full compliance with IEPA standards. The State contends that the issue of whether the violations are ongoing is only relevant in fashioning the relief necessary to preserve the *status quo.*

The State cites a number of decisions upholding injunctions for past violations. (*People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 441 N.E.2d 1328; *People v. Van Tran Electric Corp.* (1987), 152 Ill. App. 3d 175, 503 N.E.2d 1179; *People v. Keeven* (1979), 68 Ill. App. 3d 91, 385 N.E.2d 804; *Environmental Protection Agency v. Fitz-Mar, Inc.* (1988), 178 Ill. App. 3d 555, 533 N.E.2d 524; *People v. Mika Timber Co.* (1991), 221 Ill. App. 3d 192, 581 N.E.2d 895.) The trial court noted two features that distinguish these cases from the case at hand. Leaving aside *Miller,* a case involving securities fraud, each of the decisions cited involved defendants who were actually polluting the environment. In the case at bar, there have been no allegations of off-site pollution.

The other distinguishing feature in these cases is the fact that most of the decisions involve defendants who demonstrated an unwillingness to cooperate with IEPA demands. In contrast, the trial judge noted in the case at bar that SLI was actively improving the condition of the site and trying to cooperate with the IEPA. Moreover, the site is currently meeting all IEPA requirements. The issue before us, then, is whether the trial court has discretion to deny injunctive relief for

past technical violations of the Act where there is no present indication that the violations will continue.

The State brought its motion for preliminary injunction under section 42(e) of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1042(e)), which allows the Attorney General to institute a civil action for an injunction to restrain violations of the Act. It is well settled that where a statute expressly authorizes injunctive relief to enforce its provisions, the general rules of equity which require a showing of irreparable injury and a lack of an adequate remedy at law need not be shown. (*People v. Fiorini* (1991), 143 Ill. 2d 318, 345-46, 574 N.E.2d 612, 623.) The common law requirements for the issuance of equitable relief are suspended because the legislature has already determined, in passing the applicable statute, that violations of the statute cause irreparable injury for which no adequate remedy exists. (*Sadat v. American Motors Corp.* (1984), 104 Ill. 2d 105, 113, 470 N.E.2d 997, 1001.) When the statute authorizes such action, plaintiffs need only show a defendant's violation of the Act and that plaintiffs have standing to pursue the cause. *Fitz-Mar*, 178 Ill. App. 3d at 560, 533 N.E.2d at 527.

Relying on a line of cases originating in the Fifth District Appellate Court, the State contends that, "once a violation has been shown, the trial court has no discretion to refuse to issue an injunction." (*Mika*, 221 Ill. App. 3d at 193, 581 N.E.2d at 897.) The rule originates in *Keeven* and is ostensibly based upon the holding in *People ex rel. Carpentier v. Goers* (1960), 20 Ill. 2d 272, 170 N.E.2d 159, where a defendant attacked the sufficiency of a motion for preliminary injunction on the grounds that the complaint failed to allege irreparable injury and that the remedy at law was inadequate. The supreme court responded:

> "Both of these propositions are negatived by the statute which expressly authorizes issuance of an injunction 'to enforce the provisions of this Act, in addition to the penalties and other remedies in this Act provided.' " (*Carpentier*, 20 Ill. 2d at 276, 170 N.E.2d at 161, quoting Ill. Rev. Stat. 1959, ch. 95½, par. 2—116.)

While offering support for the commonly accepted principle that the general rules of equity are suspended, we find no basis for concluding that a trial court thereby forfeits all discretion in the determination whether to grant or deny injunctive relief. As described in Illinois Law and Practice:

> "The granting or denial of an injunction lies within the sound discretion of the court, and an injunction is granted only be-

cause the court is of the opinion that it ought to do so. The court's discretion is not controlled by technical legal rules.

The power of a court to issue an injunction grows out of the inadequacy of other means to effect its purpose and protect individual and property rights, and the remedy by injunction should not be extended in its operation to cases not falling within well recognized principles. An injunction will not be ordered where it will operate oppressively, is not the fit and appropriate mode of redress under all the circumstances, or may work immediate mischief." 21A Ill. L. & Prac. *Injunctions* §11, at 256 (1977).

See also *Armstrong v. Crystal Lake Park District* (1985), 139 Ill. App. 3d 991, 487 N.E.2d 648; *Board of Education of Hawthorne School District No. 17 v. Eckmann* (1982), 103 Ill. App. 3d 1127, 432 N.E.2d 298.

The violations claimed on appeal represent only a small portion of the original allegations presented to the trial court. Most of these allegations were dismissed as groundless. Other alleged violations were found to be the result of a lack of communication between the parties. Also significant is an indication in the trial record that some measure of overt political influence may have been involved in the IEPA's handling of this matter. As the trial judge noted, despite SLI's efforts to improve the site and correct violations created by prior owners, SLI was not getting the usual cooperation from the IEPA.

Conclusive evidence of daily-cover violations is lacking. However, if we ignore the underlying circumstances, the record clearly indicates that SLI violated the Act when it failed to produce asbestos-waste records on request. Similarly, if we ignore SLI's extensive efforts to improve the condition of the site and bring it into compliance, we must also conclude that SLI violated the height limitations required in its permit. Moreover, if we ignore the fact that SLI's failure to submit an acceptable closure and post-closure plan is at least partly the result of noncooperation on the part of the IEPA, then we must once again find SLI in violation of the Act. This we will not do. A trial court should not be required to blindly exercise its equitable powers. We agree with the State insofar as a violation need not be ongoing for injunctive relief to issue. However, consideration of current conditions and the circumstances underlying alleged violations is indispensable in determining whether injunctive relief is an appropriate mode of redress.

A preliminary injunction is an extraordinary remedy, to be issued only with the utmost care. (*Oscar George Electric Co. v. Metropolitan*

*Fair & Exposition Authority* (1982), 104 Ill. App. 3d 957, 433 N.E.2d 958.) To forfeit its discretion in the exercise of injunctive relief is to allow the legislature to appropriate the court's equitable powers. Section 42(e) of the Act provides that the Illinois Attorney General may seek an injunction from the courts. It does not say he will, in all cases, prevail.

The fact that the common law requirements for injunctive relief have been waived is evidence the court *presumes* a violation of the statute has caused, or will cause irreparable injury for which no adequate remedy at law exists. However, this presumption may be rebutted. The decision to grant or deny a preliminary injunction will always rest within the sound discretion of the trial court and will not be disturbed unless the court's findings are against the manifest weight of the evidence. (*Bryant v. Village of Sherman* (1990), 204 Ill. App. 3d 583, 561 N.E.2d 1320.) The trial court's ruling was not against the manifest weight of the evidence and is therefore affirmed.

Affirmed.

McCULLOUGH and COOK, JJ., concur.