THE PEOPLE *ex rel.* JAMES E. RYAN, Attorney General, *et al.*, Plaintiffs-Appellees, v. McHENRY SHORES WATER COMPANY *et al.*, Defendants-Appellants.

Second District   No. 2—97—0500

Opinion filed March 27, 1998.

Thomas D. Nuelle, of Kell, Nuelle & Loizzo, of Woodstock, for appellants.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Susan Frederick Rhodes and Erik G. Light, Assistant Attorneys General, of counsel), for appellees.

PRESIDING JUSTICE GEIGER delivered the opinion of the court:

The defendants, McHenry Shores Water Company (McHenry Shores) and Thomas Mathews, appeal from the April 4, 1997, judgment of the circuit court of McHenry County ordering them to pay civil penalties in the amount of $25,000. The trial court imposed these penalties after finding that the defendants had violated section 18 of the Illinois Environmental Protection Act (the Act) (415 ILCS 5/18 (West 1994)). We affirm.

The facts relevant to the disposition of this appeal are as follows. McHenry Shores is a public water supply company that supplies water to several hundred residents in the City of McHenry. Thomas Mathews is the sole shareholder of McHenry Shores.

On February 15, 1994, Manny Abad, acting supervisor of the Division of Public Water Supply, Elgin Region, of the Illinois Environmental Protection Agency (the Agency), conducted a routine on-site inspection of the McHenry Shores water system, with Mathews present. During this inspection, Abad noted numerous violations of the Act and its related regulations. These violations were as follows: (1) the casing of well No. 2 was less than 18 inches above the ground level; (2) the water system lacked a sufficient number of hydrants to adequately flush the system; (3) McHenry Shores had failed to submit sufficient raw water samples for bacteriological testing; (4) McHenry Shores had failed to comply with the testing and reporting requirements for fluoride and chlorine levels; (5) the water system violated the rules governing the discharge of water from overflow pipes of water storage tanks; (6) McHenry Shores lacked a cross-connection contamination ordinance and survey; and (7) the fluoride concentration in well No. 1 was below the required minimum level.

On June 17, 1994, the Agency followed up Abad's inspection with an enforcement letter. This letter informed Mathews of the specific .

violations and provided him seven days to respond. The Agency did not receive a response from Mathews within seven days.

In July 1994, the residents served by McHenry Shores held a meeting. A representative of the Agency attended the meeting to take the residents' complaints about the water supply. Numerous residents complained that their water was discolored and had an offensive odor. Other residents complained of heavy sedimentation or inadequate water pressure. Based on these complaints, the Agency tested the McHenry Shores system for pumping capacity and found that well No. 2 was overpumping.

On August 26, 1994, Mathews telephoned the Agency in response to the enforcement letter and expressed his desire to remedy the violations without litigation. During the month of August 1995, McHenry Shores dug a third well in order to increase the pumping capacity of the system. McHenry Shores also started to comply with the sampling and testing requirements of raw water samples for bacteria, as well as with the requirement that it compile monthly reports detailing the daily levels of chlorine and fluoride.

McHenry Shores' efforts, however, were insufficient to cure all of the violations. For example, in an effort to comply with the requirement that all well casings be at least 18 inches above the surrounding ground level, McHenry Shores simply dug a ditch near the pump house for well No. 2 so that water would not flood the well. Additionally, while McHenry Shores adopted a cross-connection contamination ordinance, it did not perform the required survey. Although McHenry Shores attempted to repair the broken overflow pipe, it only effected a temporary repair using rubber and duct tape. Finally, McHenry Shores made no effort to add the necessary hydrants to adequately flush the system.

On December 21, 1994, the State of Illinois filed an 11-count complaint against McHenry Shores and Mathews alleging various violations of the Act and of the regulations of the Illinois Pollution Control Board (Board). The complaint alleged that the defendants (1) failed to operate a water system with the capacity to meet the average daily demand (count I); (2) failed to operate a public water supply system that provided water that was assuredly safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption (count II); (3) failed to extend the well casing at least 18 inches above the surrounding ground surface at well No. 2 (count III); (4) failed to have a sufficient number of hydrants to adequately flush the distribution system (count IV); (5) failed to submit sufficient numbers of raw water bacteriological samples (count V); (6) failed to submit water samples for testing of

volatile organic compounds (count VI); (7) failed to report the fluoride ion concentration and chlorine residuals in the finished water (count VII); (8) failed to test and record the fluoride ion concentration and chlorine residuals on a daily basis (count VIII); (9) failed to release overflow from the water storage tank within 12 to 24 inches of the ground level (count IX); (10) failed to adopt a cross-connection contamination ordinance, survey, and control program (count X); and (11) failed to maintain the required fluoride ion concentration (count XI). The complaint sought an order enjoining the defendants from violating each of these regulations promulgated by the Board.

The cause proceeded to a bench trial on October 30, 1995. At the trial, the State elicited the testimony of nine McHenry residents who received their water service from McHenry Shores. These witnesses testified that sometimes the water had a strong smell of chlorine and other times smelled foul, putrid, and like "river water." All of the residents found these odors to be offensive and occasionally even nauseating. Frequently, the water had a rusty, orangish appearance. The discolored water stained the residents' toilet bowls, bathtubs, and any clothes that were washed in a washing machine. Additionally, the water often appeared cloudy or effervescent. Many residents also experienced periods of both low or no water pressure.

Some of the residents testified that they believed that the water had caused health problems. One resident, John Zappetillo, testified that he suffered a tremendous burning sensation in his eyes from excessive chlorine after using the water to rinse his contact lenses. Other residents testified to having experienced diarrhea and stomachaches after drinking the water. However, no doctor ever attributed any of the residents' illnesses to the water supply.

Another resident, Gill Buchanan, testified that his house was located near the McHenry Shores' water storage tank. Buchanan testified that, for several years, the tank's overflow pipe was broken at a point 80 feet above the ground surface. The pipe leaked so much that, in instances when the wind was blowing in the right direction, the water would spray all over his house. Buchanan testified that he would wake up in the middle of the night and think that it was raining, when in fact it was actually the water from the overflow pipe spraying onto the house.

Abad also testified on behalf of the State. According to Abad, the Agency had received numerous complaints from the residents about the water supplied by McHenry Shores. In addition to those complaints received at the July 1994 residents' meeting, the Agency had received at least 30 complaints about water quality between 1993 and 1995.

Fred Batt, the director of public works for the City of McHenry, testified on behalf of the defendants. He testified that he had been instructed by the City of McHenry to conduct auxiliary tests of the water system and that he had conducted these tests over a period of 12 months. All of his test samples of the water were found to be bacteriologically safe and were also found to have met all of the applicable standards for drinking water.

Mathews testified regarding the steps McHenry Shores had taken to improve its performance. Mathews testified that McHenry Shores had complied with all bacteriological testing in 1995. He also testified that he had fixed the broken overflow pipe with industrial rubber and duct tape. As for the level of the casing of well No. 2, he stated that the City of McHenry piled dirt on the lots near the pump house for well No. 2. Mathews admitted that McHenry Shores owned the land on which the fill was placed and that he had allowed the fill to be placed there. According to Abad, the casing of well No. 2 was below the surrounding ground level.

On April 24, 1996, at the conclusion of the trial, the trial court entered an order finding the defendants liable on 7 of the 11 counts of the complaint (counts I, II, III, IV, IX, X, and XI). The only counts at issue on appeal are counts II, III, IX, and X. As to count II, the trial court found that the State proved that the defendants had violated the provisions of the Act by failing to provide a supply of water that was "assuredly safe" and enjoined both McHenry Shores and Mathews from operating a public water supply system in such a manner. As to count III, the trial court found that the defendants had violated the requirement that all well casings be at least 18 inches above the surrounding ground surface and enjoined them from operating well No. 2 in violation of that requirement. As to count IX, the trial court found that the defendants had permitted the overflow pipe from the water tower to remain in a condition of disrepair and enjoined them from operating the overflow pipe without a permanent repair to the break. As to count X, the trial court found that the defendants were not in full compliance with the required cross-connection contamination control program and enjoined them from operating the water supply system without being in compliance with the applicable cross-connection control program requirements.

As to counts II, III, IX, and X, the trial court found that the imposition of civil penalties was warranted as an aid in the enforcement of the Act. The trial court imposed penalties totaling $85,000 ($50,000 for count II; $25,000 for count III; $5,000 for count IX; and $5,000 for count X). The trial court stayed the payment of these penalties for a period of six months and ordered that it would consider

remitting all or a portion of the penalties upon satisfactory proof that the defendants had remedied the violations. Although the trial court enjoined the defendants from operating the water system in the manner detailed above, it did not enjoin them from continuing to provide water service to the affected residents.

On March 4, 1997, the trial court held a hearing on the defendants' petition to remit penalties. At the hearing, the defendants called Abad, who testified that the defendants had remedied the violations concerning the overflow pipe, the level of the well casing, the number of hydrants, and the cross-connection contamination control program. Abad also testified, however, that the installation of additional hydrants would not necessarily improve the water quality of the system. Abad also noted that the defendants had been aware of the numerous violations in the early 1990s but had failed to cure the violations until 1996.

Mathews testified that the total cost to the company for complying with the trial court's order was approximately $34,000. Mathews testified that McHenry Shores had a gross revenue of $82,101 in 1994 and that there was a loss of $27,549 that same year.

On April 4, 1997, after considering all of the evidence, the trial court entered an order granting partial remission of the penalties. The trial court remitted the various civil penalties as follows: (1) count II—$50,000 penalty remitted to $20,000; (2) count III—$25,000 penalty remitted to $2,500; (3) count IX—$5,000 penalty remitted to $2,500; (4) count X—$5,000 penalty remitted in full. The final penalty amounted to $25,000. The defendants filed a timely notice of appeal.

The defendants' first contention on appeal is that the trial court erred in granting injunctive relief without first making a specific finding that the water supply was contaminated. The defendants argue that, although section 42(e) of the Act permits the State to seek injunctions for violations of the Act (415 ILCS 5/42(e) (West 1994)), Illinois courts have generally imposed such remedies in response to specific acts of pollution. See generally *People v. Fiorini*, 143 Ill. 2d 318 (1991). The defendants conclude that, because the water supply was found to be bacteriologically safe for consumption, the trial court was without the authority to issue an injunction under section 42(e) of the Act. The defendants contend that, in issuing such an injunction, the trial court improperly invaded the province of the Illinois Pollution Control Board (the Board).

Section 18(a)(2) of the Act specifically prohibits any individual from violating the regulations or standards adopted by the Board pursuant to its authority under the Act. 415 ILCS 5/18(a)(2) (West 1994). Section 42(a) of the Act provides that any person who violates

"any provision of [the] Act or any regulation adopted by the Board *** shall be liable to a civil penalty *** not to exceed $50,000 for the violation and an additional civil penalty *** not to exceed $10,000 for each day during which the violation continues." 415 ILCS 5/42(a) (West 1994). Additionally, section 42(e) provides as follows:

> "(e) The State's Attorney of the county in which the violation occurred, or the Attorney General, may, at the request of the Agency or on his own motion, institute a civil action for an injunction to restrain violations of this Act." 415 ILCS 5/42(e) (West 1994).

■ Our reading of these provisions leads us to conclude that the State's Attorney and the Attorney General may institute a civil action in the appropriate circuit court to "restrain violations of the Act." *People v. Staunton Landfill, Inc.*, 245 Ill. App. 3d 757, 768 (1993). Indeed, the plain language of section 42(e) envisions that the circuit court will issue an injunction to prevent continuing violations of the Act. See *Fiorini*, 143 Ill. 2d at 346.

In the instant case, the State's Attorney of McHenry County and the Attorney General instituted a civil action seeking to enjoin McHenry Shores and Mathews from violating specific Board regulations. As noted above, section 18(a)(2) provides that any violation of the Board's regulations is also a violation of the Act. 415 ILCS 5/18(a)(2) (West 1994). Therefore, provided that the State has met its burden in proving that the defendants violated the Board regulations described above, the trial court acted within its authority under section 42(e) in issuing an injunction. See *Staunton Landfill*, 245 Ill. App. 3d at 768.

Additionally, contrary to the defendants' assertions, we do not believe that the trial court is limited under section 42(e) to imposing injunctions only in those cases where there have been specific acts of pollution. Rather, our reading of the applicable case law demonstrates that the trial court may enjoin the offender from committing even technical violations of the Board's regulations. See *People v. Mika Timber Co.*, 221 Ill. App. 3d 192, 194 (1991) (State justified in seeking injunctive relief against operator of a wood-treatment facility for violation of permit requirements); *People v. Keeven*, 68 Ill. App. 3d 91, 97 (1979) (State entitled to injunctive relief upon demonstrating that the defendant had violated the Act by failing to secure the necessary permit). For these reasons, we conclude that the trial court had authority under section 42(e) to enjoin the defendants from violating those Board regulations detailed above.

■ The defendants' second argument on appeal is that the trial court's refusal to shut down the water system was irreconcilably inconsistent with its determination that the water failed to meet the

regulatory standards in terms of quality, cleanliness, quantity, and mineral content. The defendants argue that, if the water supply posed a real threat to human health, then the trial court should have issued a temporary restraining order shutting down McHenry Shores.

We believe that such an argument is without merit. As noted by the State, the trial court could have reasonably concluded that the public health risk posed by not having any water at all was greater than the risk posed by consuming the water provided by McHenry Shores. Although the water was often discolored, cloudy, and had a foul odor, there was no evidence presented that the water posed a direct health hazard beyond mere discomfort or unpleasantness. Nor are we aware of any authority that prohibited the trial court from limiting the scope of its injunction to specific violations of the Act. For these reasons, we do not believe that the trial court's findings were irreconcilably inconsistent.

The defendants' next argument on appeal is that the trial court's finding that the water supplied by McHenry Shores was not "assuredly safe" was against the manifest weight of the evidence. As noted above, in imposing injunctive relief and civil penalties as to count II of the State's complaint, the trial court found that McHenry Shores had violated the Board's regulations by failing to provide water that was "assuredly safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption." In support of their argument, the defendants rely on Batt's testimony that the water supply was bacteriologically safe for consumption.

It is well settled that the trial court's findings of fact will not be disturbed unless they are clearly contrary to the manifest weight of the evidence. *Yale Development Co. v. Texaco, Inc.*, 51 Ill. App. 3d 616, 619 (1977). A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent, or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995). We will not overturn a judgment merely because we disagree with it or because we might have come to a different conclusion had we been the trier of fact. *Greene v. City of Chicago*, 73 Ill. 2d 100, 110 (1978).

As to count II, the trial court specifically found that the defendants had violated Board regulation 601.101. 35 Ill. Adm. Code § 601.101 (1994). The regulation provides as follows:

"Owners and official custodians of a public water supply in the State of Illinois shall provide pursuant to the Environmental Protection Act [citation] ***, the Pollution Control Board *** Rules, and the Safe Drinking Water Act [citation] continuous

operation and maintenance of public water facilities so that the water shall be assuredly safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption." 35 Ill. Adm. Code § 601.101 (1994).

■ Contrary to the defendants' assertions, this provision goes beyond the mere requirement that the water be bacteriologically safe for consumption. Rather, the water supply must be clean and not cause offense to the user. See *Farmer v. Stahl*, Ill. Pollution Control Bd. Op. 84—149 (March 14, 1986). In *Farmer*, the water provided by a public water company had a strong chlorine odor and a rusty color. Several residents also testified that the water was "fizzy" and "cloudy" and that there were often periods of both low and no water pressure. Although no chemical analysis of the water was undertaken, it was nonetheless found to violate the requirements of regulation 601.101. *Farmer*, at 6-7.

A review of the record in the instant case confirms the trial court's conclusion that the defendants violated Board regulation 601.101 by failing to provide a public water system that was "assuredly safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption" (35 Ill. Adm. Code § 601.101 (1994)). As detailed above, numerous residents testified that the water supplied to them by the defendants was discolored, ranging from yellow to red to brown. Residents also testified that the water had a foul chlorine odor and contained various types of particulate matter. One resident produced a water sample that he drew from his kitchen tap and described it as looking like "iced tea."

The State also presented substantial evidence that the water supplied by the defendants was not "adequate in quantity." One resident testified that she had had inadequate water pressure every summer since 1990 and that, during the summer of 1995, she did not have water on the second floor of her house for a period of three days. Another resident testified that, shortly after moving into the subdivision in 1994, he experienced an extreme drop in water pressure to the point where he had almost no water at all. Several other residents gave similar accounts of inadequate water pressure or complete outages.

Based on such evidence, we agree with the trial court that the State satisfied its burden of proving that the water provided by McHenry Shores was in violation of Board regulation 601.101. We therefore conclude that the trial court's findings were not contrary to the manifest weight of the evidence.

As its final contention on appeal, the defendants argue that the civil penalties assessed against them were excessive and punitive in

nature. As noted above, the trial court imposed a total of $25,000 in civil penalties. The defendants note that this amount represents 33% of its gross revenues and argue that such an amount is punitive and not an aid to enforcement of the Act. The defendants contend that the trial court's order will place McHenry Shores in a position where it may need to seek bankruptcy protection.

■ Section 42(a) of the Act permits the court to impose penalties against those who violate any provision of the Act or any regulation adopted by the Board. 415 ILCS 5/42(a) (West 1994). As noted above, the trial court may impose a maximum penalty of $50,000 for each violation of the Act, and an additional $10,000 penalty for each day that the violation continues. 415 ILCS 5/42(a) (West 1994). Although the potential penalties under section 42(a) are large, the purpose of the penalties is primarily to aid in the enforcement of the Act; punitive considerations are secondary. *Fiorini*, 143 Ill. 2d at 349. The imposition of civil penalties under section 42(a) is discretionary, and such a determination will not be disturbed on review unless it is clearly arbitrary, capricious or unreasonable. *ESG Watts, Inc. v. Pollution Control Board*, 282 Ill. App. 3d 43, 50-51 (1996).

In determining the appropriate civil penalty to be imposed, the trial court is authorized, but not limited, by section 42(h) to consider the following factors:

"(1) the duration and gravity of the violation;

(2) the presence or absence of due diligence on the part of the violator in attempting to comply with requirements of this Act and regulations thereunder or to secure relief therefrom as provided by this Act;

(3) any economic benefits accrued by the violator because of delay in compliance with requirements;

(4) the amount of monetary penalty which will serve to deter further violations by the violator and to otherwise aid in enhancing voluntary compliance with this Act by the violator and other persons similarly subject to the Act; and

(5) the number, proximity in time, and gravity of previously adjudicated violations of this Act by the violator." 415 ILCS 5/42(h) (West 1994).

●7 A review of the record in the instant case reveals that the trial court considered the factors set forth in section 42(h). The trial court specifically cited the first four factors as the basis for its decision as to the final penalty amount. The court particularly emphasized the fourth factor, concerning the need to deter further violations by the violator and to otherwise aid in enhancing voluntary compliance with the Act by the violator and others. 415 ILCS 5/42(h)(4) (West 1994).

In view of the defendants' numerous and long-standing violations of the provisions of the Act and the regulations of the Board, we believe the trial court's determination of civil penalties to be well founded, and we will not disturb its findings. See *ESG Watts, Inc.*, 282 Ill. App. 3d at 52.

In so ruling, we note that there is no specific statutory provision which limits the amount of civil penalties that can be imposed to a certain percentage of the violator's gross annual income. Rather, the trial court has the discretion to determine the appropriate penalty in light of the factors enunciated above. *ESG Watts, Inc.*, 282 Ill. App. 3d at 52. As we have already noted, we believe that the $25,000 penalty imposed by the trial court was appropriate to aid in the enforcement of the Act and to deter the defendants from future violations.

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

BOWMAN and THOMAS, JJ., concur.