THE PEOPLE *ex rel.* JAMES E. RYAN, Plaintiff-Appellant and Cross-Appellee, v. AGPRO, INC., *et al.*, Defendants-Appellees and Cross-Appellants.

Second District No. 2—03—0021

Opinion filed January 27, 2004.

1012

Lisa Madigan, Attorney General, of Chicago (Erik G. Light, Assistant Attorney General, of counsel), for appellant.

Donald Q. Manning, of McGreevy, Johnson & Williams, P.C., of Rockford, for appellees.

JUSTICE KAPALA delivered the opinion of the court:

The State brought an action in 1994 against defendants, Agpro, Inc. (Agpro), and David J. Schulte (Schulte), individually and as president of Agpro, alleging violations of the Environmental Protection Act (the Act) (415 ILCS 5/1 *et seq.* (West 1992)). The State sought injunctive relief, cost recovery, and civil penalties. The matter was tried to the court without a jury in 2002. The trial court entered judgment in favor of the State and against defendants in the amount of $54,432.25 for the State's pre-July 1996 remediation costs and imposed a $5,000 civil penalty against defendants. The State appeals and defendants cross-appeal.

## I. FACTS

In a second amended complaint for injunctive relief, cost recovery, and civil penalties the State alleged that from May 1988 to April 1993

Schulte was the president of Agpro, an Illinois corporation engaged in the business of custom application and distribution of agricultural pesticides and fertilizers. It was alleged further that defendants were the owners of the Agpro site located at 803 Central Street in the town of Woosung (Agpro site). In count I, titled "Water Pollution," it was alleged that defendants, as a result of their business operations, caused or allowed pesticides to be discharged upon the ground and, in turn, into the surface water and groundwater in violation of section 12(a) of the Act (415 ILCS 5/12(a) (West 1996)). The State alleged that the water pollution was ongoing and prayed for a finding that defendants violated section 12(a) of the Act. In count II it was alleged that defendants created a water pollution hazard in violation of section 12(d) of the Act (415 ILCS 5/12(d) (West 1996)). In count III it was alleged that defendants violated section 12(a) and spill prevention regulations (35 Ill. Adm. Code § 306.102(b) (2003)). In these first three counts, the State also prayed for an order enjoining defendants from further violations of the Act and requiring them to remediate the environmental damage they caused; civil penalties; and the State's costs in bringing the action. In count IV, the State sought recovery pursuant to section 22.2 of the Act (415 ILCS 5/22.2 (West 1996)) for its remediation costs.

A two-day bench trial was held in September 2002. The trial court entered a memorandum opinion and judgment order containing its findings of fact and conclusions of law. The trial court found that soil samples taken by agents of the Illinois Environmental Protection Agency (IEPA) in April 1989 and October 1990 from locations on the Agpro site showed contamination with the pesticides alachlor, atrazine, and metolachlor. Soil samples taken in October 1990 from locations in Woosung away from the Agpro site showed no contamination with those pesticides. Soil samples collected in December 1993 from the Agpro site showed contamination with the pesticides alachlor, atrazine, metolachlor, and metribuzin. Those same soil samples showed extremely high levels of ammonia and nitrates. Soil samples collected in December 1993 from locations in Woosung away from the Agpro site showed no contamination with pesticides or nitrates and significantly lower levels of contamination with ammonia. Soil samples collected from the Agpro site in October 2000 were contaminated with high concentrations of ammonia and nitrates, as well as with alachlor, metolachlor, atrazine, and other pesticides. Soil samples collected from locations away from the Agpro site in October 2000 had no detectible ammonia, much less contamination with nitrates, and no detectible contamination with pesticides.

The trial court found further that water samples from private

wells at and immediately surrounding the Agpro site collected in December 1988, February 1989, March 1989, April 1989, February 1990, October 1990, March 1991, December 1992, and February 1993 contained levels of various pesticides that exceeded maximum contamination levels of the Illinois Pollution Control Board and the United States Environmental Protection Agency. Samples taken in March 1989 of water from wells in Woosung farther away from the Agpro site showed no detectible contamination. Well water samples collected in December 1992, February 1993, May 1993, November 1993, December 1993, January 1999, August 2000, and October 2000 indicated that the level of pesticide contamination in private wells at and immediately surrounding the Agpro site decreased over time beginning shortly after defendants ceased operations. Over time, the plume of contaminated groundwater had moved farther out from the Agpro site, with lower levels of pesticide contamination reaching outlying private wells.

The trial court found that Schulte admitted in a July 1988 conversation with an IEPA inspector that he intentionally rinsed out the pesticide/fertilizer application vehicles, or "floaters," on the gravel area at the Agpro site. During the same conversation, Schulte also admitted that one of his floaters leaked at least 100 gallons of metolachlor solution onto the ground at the Agpro site. Schulte admitted in a letter that he wrote to the IEPA that, at least prior to July 1988, his floaters were rinsed out at the Agpro site.

The trial court found credible the trial testimony of Woosung resident and former Agpro employee Paul Biggerstaff. Biggerstaff lived adjacent to the Agpro site for 17 years and worked for Agpro as part-time seasonal help in the early to mid-1980s. Biggerstaff testified that while he was working for Agpro, Agpro employees rinsed out chemical containers onto the ground every day and floaters were routinely emptied of residual product over the drain at the Agpro site. Biggerstaff testified about two large spills that occurred during the time that he worked for Agpro and one that occurred after he stopped working for Agpro. Biggerstaff also testified that Agpro floaters leaked their product onto the street and the chemicals collected at the side of the road near his and other houses.

The trial court also found credible the trial testimony of Bruce Lambert, who at one time worked as a floater driver for Agpro. Lambert testified that the solution produced from rinsing out the inside of the floater "would have gone right on the gravel parking lot with everything else." Additionally, the trial court credited the testimony of Allen Mackey, who related that the floaters were rinsed off and washed out at the Agpro site.

Further, the trial court found credible the testimony of James Salch, an IEPA project manager and geologist with expertise regarding soil contamination by pesticides and fertilizers. Salch testified to the following factual indicators that defendants' operations and the contaminated soil on the Agpro site caused or contributed to the pesticide and fertilizer contamination of the private water wells in Woosung. Soil samples collected away from the Agpro site were below analytical detection limits for pesticides, showing that the groundwater contamination of the private wells and the soil contamination on the Agpro site did not come from the adjacent fields; the pesticides (alachlor, atrazine, metolachlor, metribuzine, and cyanazine) that were found in the soil samples collected on the Agpro site were also found in the water collected from private wells in Woosung; the private wells where pesticide contamination was detected were all very close or right next to the Agpro site; and the pesticide contamination in the private wells peaked near the time that Agpro ceased operations and has since decreased. However, Salch admitted that he could not determine that the activities of Agpro, as opposed to the prior site operators, were responsible for the contamination found at the Agpro site.

As to count I of the second amended complaint, the trial court concluded that defendants caused or allowed water pollution in violation of section 12(a) of the Act by discharging contaminants into the environment through spillage, solution from washing trucks, and leakage from trucks at the Agpro site. As to count II, the trial court concluded that defendants deposited contaminants on the land, creating a water pollution hazard in violation of section 12(d) of the Act. As to count III, the State declares that the trial court found that defendants failed to provide required secondary containment areas to prevent the spilling of contaminants in violation of section 12(a) of the Act. After reviewing the trial court's order, however, it is unclear to us whether the court found a violation of the Act as alleged in count III. The trial court concluded further that Schulte was personally liable under the Act for the violations Agpro committed when Schulte was president of Agpro. The trial court found that Schulte caused or allowed the contamination of the Agpro site and had control over the pollution or was in control of the area from where the pollution occurred and did not take precautions to prevent the pollution.

As to the State's request in count IV for recovery of its costs incurred in performing remedial actions at and around the Agpro site, the trial court concluded that section 22.2(f) of the Act (415 ILCS 5/22.2(f) (West 2002)) provided for the recovery of such costs. However, the trial court determined that, although defendants' conduct certainly

contributed to the contamination, the evidence did not conclusively show that defendants were the sole source of the contamination of the wells in Woosung. The trial court concluded that defendants were responsible for all the costs incurred by the State prior to July 1, 1996, totaling $54,432.25, and entered a joint and several judgment against defendants in that amount.

The trial court found that Agpro had not been in operation since 1993 and no longer existed as a legal entity; that defendants were not currently engaged in any activities that would require an injunction; that there was no evidence that Schulte had any continuing ownership interest in the Agpro site giving him authority to do anything at the site; and that there was no legal basis to issue an injunction requiring defendants to perform affirmative acts. Therefore, the trial court denied the State's request for injunctive relief.

The trial court imposed a civil penalty against defendants in the amount of $5,000 and entered a joint and several judgment against defendants in that amount. Lastly, the trial court ordered that defendants reimburse the State for the costs it incurred in bringing the action. The State's appeal and defendants' cross-appeal followed.

## II. ANALYSIS

### A. THE STATE'S CONTENTIONS ON APPEAL

#### 1. Defendants' Remediation Obligation

The State's first contention is that the trial court erred in refusing to order defendants to clean up the Agpro site. In its prayer for relief at the conclusion of count I of the second amended complaint, the State requested an order:

"Ordering AGPRO and David Schulte to conduct a Remedial Investigation and Feasibility Study to determine the nature and extent of the contamination to the surface and groundwaters and the water supply wells of the residences and businesses in the Village of Woosung, and to take all measures necessary to correct the ecological problems, including the removal of all pesticide contaminated soils from the site to a permitted disposal site and the remediation of any contaminated groundwater ***."

In counts II and III, the same request was made excluding the remediation of any contaminated groundwater. The trial court gave three bases for denying these requests: (1) there was no legal basis to issue an injunction requiring defendants to perform affirmative acts; (2) Agpro no longer existed; and (3) there was no evidence showing that Schulte had any continuing connection to, or ownership interest in, the Agpro site.

■ The State contends that the Act authorized the trial court to

order defendants to take affirmative steps to remediate the contamination they caused. The State argues that, given the evidence of a continuing water pollution hazard at the Agpro site due to the contaminated soil, section 42(e) of the Act authorized the trial court to order defendants to take affirmative steps to remediate the Agpro site. Section 42(e) of the Act provides that "[t]he State's Attorney of the county in which the violation occurred, or the Attorney General, may, at the request of the Agency or on his own motion, institute a civil action for an injunction to restrain violations of this Act." 415 ILCS 5/42(e) (West 2000). Defendants assert that the only way to "restrain" a continuing violation of the Act is to order the violator to take steps to put an end to the continuing violation.

■ Whether section 42(e) of the Act provides authority for the issuance of a mandatory injunction in this case is a question of statutory interpretation. The cardinal principle of statutory interpretation is that the court must effectuate legislative intent. *In re Justin M.B.*, 204 Ill. 2d 120, 123 (2003). The best indicator of legislative intent is statutory language. *In re Justin M.B.*, 204 Ill. 2d at 123. If the statutory language is plain, the court cannot read limitations or conditions into the statute. *In re Justin M.B.*, 204 Ill. 2d at 124. We review *de novo* issues of statutory interpretation. *In re Justin M.B.*, 204 Ill. 2d at 124.

■ We note that the use of the word "restrain" in section 42(e) connotes that the legislature contemplated a preventative injunction or restraining order rather than a mandatory injunction commanding a defendant to do some affirmative act. Also, we believe that the State's argument that section 42(e) authorized a mandatory injunction in this case misconstrues the violation of the Act alleged in the State's complaint. The State claims that defendants' continuing violation of section 12(d) of the Act would be properly restrained under section 42(e) by the issuance of a mandatory injunction requiring that defendants clean up the Agpro site. Section 12(d) provides that no person shall "[d]eposit any contaminants upon the land in such place and manner so as to create a water pollution hazard" (415 ILCS 5/12(d) (West 2000)); it does not prohibit the mere existence of a water pollution hazard on a parcel of land. In this case, because the evidence established that Agpro ceased pesticide and fertilizer application operations at the Agpro site in 1993 and, consequently, stopped depositing contaminants upon the land at that time, there was no section 12(d) violation to restrain under section 42(e).

■ The State cites *People ex rel. Hartigan v. Kerr-McGee Corp.*, 210 Ill. App. 3d 115, 122 (1991), for the proposition that once the State proves a violation of the Act, the trial court has no discretion to

refuse an injunction to enforce the terms of the Act. The State also cites *People v. Staunton Landfill, Inc.*, 245 Ill. App. 3d 757, 769-70 (1993), for the proposition that proof of a violation of the Act establishes a rebuttable presumption that an injunction should issue. Curiously, neither of these cases advances the State's position that section 42(e) authorized the trial court to issue a mandatory injunction in this case. Neither case involved a mandatory injunction but, rather, restraining or preventative orders requiring the defendants to cease and desist in some activity. See *Staunton Landfill, Inc.*, 245 Ill. App. 3d at 758 (preliminary injunction seeking to enjoin the defendant from accepting wastes in its landfill until compliance with the Act); *Kerr-McGee Corp.*, 210 Ill. App. 3d at 118 (preliminary injunction barring defendant from constructing a facility until State environmental construction permit requirements were complied with).

■ Next, the State argues that any doubt about the trial court's authority to order a defendant to perform remedial activity was removed when the legislature enacted Public Act 89—443 (Pub. Act 89—443, eff. July 1, 1996) adding section 58.9 (415 ILCS 5/58.9 (West 1996)) to the Act. Section 58.9 is within Title XVII: Site Remediation Program, and provides in pertinent part:

> "(1) Notwithstanding any other provisions of this Act to the contrary, including subsection (f) of Section 22.2, in no event may the Agency, the State of Illinois, or any person bring an action pursuant to this Act or the Groundwater Protection Act *to require any person to conduct remedial action* or to seek recovery of costs for remedial activity conducted by the State of Illinois or any person beyond the remediation of releases of regulated substances that may be attributed to being proximately caused by such person's act or omission or beyond such person's proportionate degree of responsibility for costs of the remedial action of releases of regulated substances that were proximately caused or contributed to by 2 or more persons." (Emphasis added.) 415 ILCS 5/58.9 (a)(1) (West 2002).

The State argues that the clear implication of the above-quoted statute is that the State may seek to require a person to conduct remedial action to address releases of regulated substances that the person proximately caused.

■ Clearly, section 58.9(a)(1) references both actions to require a person to conduct remedial action and actions seeking recovery of costs for remedial activity conducted by the State. While we agree that the reference to an action seeking to require a person to conduct remedial action in section 58.9(a)(1) implies that the State can seek a mandatory injunction, we reject the State's argument that the refer-

ence provides authority for a mandatory injunction in this case. We are directed to no Illinois case law where the Act has been interpreted to permit a trial court to issue a mandatory injunction ordering a person to conduct remedial action. After carefully reviewing the Act, we conclude that the only authority therein for the issuance of a mandatory injunction, as opposed to a restraining order, is in section 43(a), titled "Injunctions or other necessary actions." Therefore, we believe that the mention of an action·for a mandatory injunction in section 58.9(a)(1) must be in reference to an injunction issued pursuant to section 43(a), which provides:

> "(a) In circumstances of substantial danger to the environment or to the public health of persons or to the welfare of persons where such danger is to the livelihood of such persons, the State's Attorney or Attorney General, upon request of the Agency or on his own motion, *may institute a civil action for an immediate injunction* to halt any discharge or other activity causing or contributing to the danger or *to require such other action as may be necessary.* The court may issue an ex parte order and shall schedule a hearing on the matter not later than 3 working days from the date of the injunction." (Emphasis added.) 415 ILCS 5/43(a) (West 2002).

We believe that the emphasized portion of section 43(a) is an express grant of authority to issue a mandatory injunction where the other requirements of that section are met. It has been held that "section 43(a) by its own terms concerns immediate injunctions on *ex parte* proceedings in circumstances of substantial danger to the environment or the health or welfare of persons." *People v. Van Tran Electric Corp.*, 152 Ill. App. 3d 175, 185 (1987). The State has not alleged that such circumstances existed in this case and in fact conceded at oral argument that section 43(a) is not applicable in this case.

The State also advances the argument that any interpretation of the Act that bars the trial court from issuing a mandatory injunction would undermine the Act's purposes. Citing section 11(b) of the Act, the State maintains that the legislature enacted the Act to "restore, maintain and enhance the purity of the waters of this State" and "to assure that no contaminants are discharged into the waters of the State *** including, but not limited to, *** into any well." 415 ILCS 5/11(b) (West 2002). The State argues that if courts cannot require polluters to clean up the contamination for which they are responsible, the legislature's express purpose in enacting the Act will be frustrated. We disagree.

The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). This intent is best evidenced by the clear and

unambiguous language of the statute. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). As we have determined above, the Act expressly provides for the issuance of a mandatory injunction to require polluters to clean up the sites they have contaminated, but only as provided in section 43(a). The State has failed to explain how the Act's purpose is frustrated where the Act, separate and apart from the State's interpretation of section 42(e), provides for the remediation of pollution through mandatory injunctions in emergency situations (415 ILCS 5/43(a) (West 2002)), by voluntary compliance of the polluter (415 ILCS 5/4(q) (West 2002)), or by the State conducting remedial activity and then recovering the costs it incurred from those liable under the Act (see 415 ILCS 5/22.2(f) (West 2002)).

Based on our holding that the issuance of a mandatory injunction under the Act was inapplicable in this case, we affirm the trial court's denial of the State's request for a mandatory injunction requiring defendants to conduct remedial action. Consequently, we need not consider the State's arguments attacking the trial court's two other bases for denying its request for the issuance of a mandatory injunction.

### 2. Defendants' Liability for the State's Remediation Costs

The State's second contention on appeal is that the trial court erred in denying the State recovery of the costs it incurred in performing remedial activities in Woosung after July 1, 1996. Defendants do not respond to this argument except to argue that the State failed to prove that defendants caused the groundwater contamination detected in the Woosung well water. We reject defendants' causation argument in part B below.

The trial court concluded that the status of the law regarding cost recovery actions makes current owners and operators of a site liable, as well as owners and operators at the time of contamination, but the liability is subject to a causation requirement for costs incurred after July 1, 1996. The trial court found that the evidence showed that the Agpro site was in operation before defendants operated it and that the evidence did not conclusively show that defendants were the sole source of contamination of the wells in Woosung, although defendants' conduct certainly contributed to the contamination. The trial court determined that the burden of proving defendants' proportionate share of responsibility for the State's remediation costs incurred after July 1, 1996, rested on the State and that "[t]he evidence does not conclusively show that Defendants were the sole source of the contamination." The trial court ruled that defendants were responsible for all the costs incurred by the State prior to July 1, 1996, and none

incurred by the State thereafter. Presumably, the trial court concluded that unless the State proved that defendants were the sole source of the contamination, the State was not entitled to recover its remediation costs incurred after July 1, 1996. While we defer to the trial court's findings of fact that are not against the manifest weight of the evidence (*In re Estate of Weiland*, 338 Ill. App. 3d 585, 603-04 (2003)), appellate review of the trial court's statutory interpretation is *de novo* (*Petersen v. Wallach*, 198 Ill. 2d 439, 444 (2002)). We believe that the trial court erred as a matter of law in analyzing defendants' liability for the State's post-July 1, 1996, remediation costs because it required the State to prove that defendants were the sole source of the groundwater pollution in order to recover those costs.

■ Section 22.2(f) provides in pertinent part:

"(f) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (j) of this Section, the following persons shall be liable for all costs of removal or remedial action incurred by the State of Illinois or any unit of local government as a result of a release or substantial threat of a release of a hazardous substance or pesticide:

(1) the owner or operator of a facility or vessel from which there is a release or substantial threat of release of a hazardous substance or pesticide;

(2) any person who at the time of disposal, transport, storage or treatment of a hazardous substance or pesticide owned or operated the facility or vessel used for such disposal, transport, treatment or storage from which there was a release or substantial threat of release of any such hazardous substance or pesticide[.]" 415 ILCS 5/22.2(f) (West 2002).

However, a causation requirement was added in 1996 (Pub. Act 89—443, eff. July 1, 1996 (adding 415 ILCS 58.9)), and is now codified in section 58.9(a)(1) of the Act, providing in pertinent part:

"Notwithstanding any other provisions of this Act to the contrary, including subsection (f) of Section 22.2, in no event may the Agency, the State of Illinois, or any person bring an action pursuant to this Act or the Groundwater Protection Act to require any person to conduct remedial action or to seek recovery of costs for remedial activity conducted by the State of Illinois or any person beyond the remediation of releases of regulated substances that may be attributed to being proximately caused by such person's act or omission or beyond such person's proportionate degree of responsibility for costs of the remedial action of releases of regulated substances that were proximately caused or contributed to by 2 or more persons." 415 ILCS 5/58.9 (a)(1) (West 2002).

Section 58.9(f) provides that "[t]his section does not apply to any cost

recovery action brought by the State under Section 22.2 to recover costs incurred by the State prior to July 1, 1996." 415 ILCS 5/58.9 (f) (West 2002).

■ Based upon these provisions, the State may recover the costs it incurred on or after July 1, 1996, when those costs are incurred remediating a release of regulated substances proximately caused by a person's acts or omissions. Also, if the release of regulated substances was caused by two or more persons, then the State may recover costs that are proportional to a person's degree of responsibility for the release. Initially, the State argues that there was no evidence presented at trial that any person other than defendants released contaminants at the Agpro site and, therefore, defendants are liable to the State for all of the State's remediation costs incurred after July 1, 1996. Alternatively, the State argues that, at a minimum, the evidence established that defendants were responsible for the "vast percentage" of the contamination and, therefore, should be responsible for the "vast majority" of the costs incurred by the State after July 1, 1996. Yet another alternative argument made by the State is that we should remand this cause to allow the trial court to make a determination of defendants' proportionate degree of responsibility for the State's post-July 1, 1996, costs. Because we hold that the trial court made no attempt to determine defendants' share of responsibility for the State's post-July 1, 1996, remediation costs, we agree with the State's last argument.

The trial court applied the incorrect legal standard after it concluded that the State failed to prove that defendants were the "sole source of contamination." Once the trial court determined that defendants contributed to the contamination of the soil at the Agpro site, which in turn contributed to the groundwater contamination, the trial court should have determined the amount of remediation costs incurred by the State on or after July 1, 1996, that were proximately caused by defendants' acts or omissions. Accordingly, we remand this cause and direct the trial court to do so.

For the trial court's benefit on remand, we note that its conclusion that the burden of proof rested with the State was correct. Pursuant to section 58.9(d), the Illinois Pollution Control Board has adopted rules and procedures for determining proportionate share, including allocating the burden of proof:

"(a) To establish a respondent's proportionate share, the complainant must prove the following by a preponderance of the evidence:

(1) That the respondent proximately caused or contributed to a release or substantial threat of a release of regulated substances or pesticides on, in, under or from a site; and

(2) The degree to which the performance or costs of a response result from the respondent's proximate causation of or contribution to the release or substantial threat of a release as established under subsection (a)(1) of this Section.

(b) Liability to perform or pay for a response that results from the release or substantial threat of a release of regulated substances or pesticides on, in, under or from a site is subject to all defenses allowed by law, including the defenses set forth in Section 22.2(j) of the Act, and the limitations set forth in Section 58.9(a)(2) of the Act. The respondent raising a defense set forth in Section 22.2(j) or a limitation set forth in Section 58.9(a)(2) of the Act must prove the defense or limitation by a preponderance of the evidence.

(c) A complainant is not required to plead a specific alleged percentage of liability for the performance or costs of a response in a complaint that seeks to require a respondent to perform or pay for a response that results from a release or substantial threat of a release of regulated substances or pesticides." 35 Ill. Adm. Code § 741.205 (2003).

## B. DEFENDANTS' CROSS-APPEAL

### 1. Opinion Testimony

Defendants' first contention on cross-appeal is that the trial court erred in allowing the State's opinion witness to testify, in violation of Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)), that defendants caused the contamination at the Agpro site. We disagree.

■ The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court unless that discretion is clearly abused. *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003). Under either the current or the former Supreme Court Rule 213, the trial testimony of an opinion witness is limited to the opinions expressed in answers to Rule 213 interrogatories or in the witness's deposition. 177 Ill. 2d R. 213(i); 210 Ill. 2d R. 213(g).

■ Defendants argue that the trial court erred in refusing to bar undisclosed testimony of the State's expert, James Salch, in violation of Rule 213. Defendants point out that Salch's deposition included testimony that the on-site and off-site contamination was the result of releases from the Agpro property. Salch's deposition also included an admission that he did not know if the contamination came from Agpro or a previous operator on the Agpro site. Defendants then highlight what they consider to be an altered opinion in an affidavit filed in support of a motion for summary judgment, where Salch swore that Agpro, at the very least, contributed significantly to the contamination. Finally, defendants concede that, despite the State counsel's efforts to

coax him to alter his opinion, Salch's trial testimony did not differ from his deposition testimony.

Defendants' argument can be disposed of summarily. There was no undisclosed trial testimony to bar. After reviewing the record, we find no opinion expressed in Salch's trial testimony that defendants, rather than a previous operator at the Agpro site, were the source of the contamination at the Agpro site. It is important to realize that two levels of pollution have been described in this case. First, there were releases of contaminants into the soil at the Agpro site. Second, the contaminated soil at the Agpro site was said to have caused contamination of the groundwater in the wells on and immediately surrounding the Agpro site. In his trial testimony, Salch opined that the contaminated soil at the Agpro site contributed significantly to the groundwater contamination detected in the private wells in Woosung, but he offered no opinion as to who or what caused the contamination of the soil:

> "It's my professional opinion that the pesticides, herbicides, and fertilizers observed and found in the soil above migration groundwater objectives have, at the very least, contributed significantly to the groundwater contamination observed in the private wells in the area.
> ***
> *** [W]hat I'm trying to say is that, you know, based on all the information that's available, that, again, it's my opinion that that—that the Agpro *facility* is a significant source of the contamination in those wells. I'm not saying they're the only possible source, but I'm again, you know, it's my professional opinion with my years of experience that that is the source of the contamination." (Emphasis added.)

The fact that he was unable to conclude that Agpro was responsible for the soil contamination at the Agpro site was made clear on cross-examination when Salch was asked the following question and gave the following answer:

> "[DEFENSE COUNSEL]: So let me try again. Based on your prior answer, isn't it true that you cannot determine, to a reasonable degree of scientific certainty, whether the contamination you found in the soils and in the groundwater was the result of activities of Agpro, Inc., and its employees versus a predecessor?
> SALCH: As I sit here right now?
> [DEFENSE COUNSEL]: Yes.
> SALCH: Then, no, I can't. I can't make that decision. Or I can't distinguish that."

Consequently, we find no Rule 213 violation as alleged by defendants.

## 2. Causation

 Defendants' second contention on cross-appeal is that the trial court erred in awarding damages in light of its finding that the State's opinion witness failed to testify regarding causation. Defendants argue that the State's proofs failed as a matter of law to establish that defendants caused the groundwater contamination. Defendants base their argument on the fact that Salch admitted that he could not determine that the activities of Agpro, as opposed to a prior operator at the Agpro site, caused the soil contamination at the Agpro site.

Defendants' second contention fails in its assumption that all the causation evidence had to come from the State's expert witness. Defendants fail to appreciate that the State proved in two steps that defendants caused the contaminated groundwater. First, Salch's testimony established by a preponderance of the evidence that the contaminated soil at the Agpro site contributed significantly to the groundwater contamination. Second, the State proved, through a variety of sources, that defendants caused, in part, the soil contamination at the Agpro site. Those sources included (1) Schulte's admissions to IEPA personnel that he intentionally rinsed out floaters on the gravel area at the Agpro site and that a floater leaked pesticide solution on the ground at the Agpro site; (2) Biggerstaff's testimony that rinsing out chemical containers and emptying residual product occurred regularly at the Agpro site; (3) Biggerstaff's testimony regarding pesticide spills; and (4) the testimony of Lambert and Mackey that floaters were rinsed out and washed off at the Agpro site. We will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence. *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 592 (1999). We cannot say that the trial court's findings were against the manifest weight of the evidence. The evidence presented by the State was sufficient to support the trial court's conclusion that the State met its burden to prove the requisite causation element by a preponderance of the evidence. This is so even though Salch did not testify that defendants, as opposed to a prior operator at the Agpro site, caused the contamination of the soil at the Agpro site.

## 3. Schulte's Personal Liability

Defendants' last contention on cross-appeal is that the trial court erred in ruling that Schulte is personally liable. Citing *People ex rel. Burris v. C.J.R. Processing, Inc.*, 269 Ill. App. 3d 1013 (1995), defendants argue that only a corporate officer who has sufficient personal involvement in the acts violating the statute may be found personally liable under the Act. Defendants argue that the State failed

to demonstrate that Schulte actively participated in the contamination so as to make him individually liable.

We review the trial court's factual findings for manifest error (*In re Estate of Weiland*, 338 Ill. App. 3d at 603-04), and its legal conclusions are subject to *de novo* review (*Woods v. Cole*, 181 Ill. 2d 512, 516 (1998)). In *C.J.R. Processing, Inc.*, the court held that "corporate officers may be held liable for their personal involvement or active participation in a violation of the Act." *C.J.R. Processing, Inc.*, 269 Ill. App. 3d at 1018. This "personal involvement" or "active participation" does not, as defendants seem to suggest, mean that the corporate officer has to perform the actual physical act that constitutes a violation in order to be held individually liable. This point is demonstrated by the *C.J.R. Processing, Inc.* court's reliance upon *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir. 1986), where the vice president of the corporation was held individually liable for violations of a federal environmental protection statute because he arranged for the disposal of waste products, and the corporation's president was held individually liable because he was personally responsible for all of the corporation's operations and had the ultimate authority to control the disposal of its waste products. *C.J.R. Processing, Inc.*, 269 Ill. App. 3d at 1017.

Moreover, the holding in *Browning Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir. 1999), is instructive. *Browning Ferris Industries of Illinois, Inc.*, was a contribution action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 *et seq.* (1994)) where the individual liability of a president and principal shareholder of two corporations was at issue. *Browning Ferris Industries of Illinois, Inc.*, 195 F.3d at 955. The Seventh Circuit said that "if [the president and principal shareholder] operated the landfill personally, rather than merely directing the business of the corporations of which he was the president and which either formally, or jointly with him (as well as with each other), operated it, he is personally liable." *Browning Ferris Industries of Illinois, Inc.*, 195 F.3d at 956.

In this case, the trial court concluded that Schulte was personally liable under the Act for the violations Agpro committed when Schulte was president of Agpro. The trial court found that Schulte caused or allowed the contamination of the Agpro site and had control over the pollution or was in control of the area from where the pollution occurred, and did not take precautions to prevent the pollution. The evidence also showed that Schulte personally ran Agpro's operations at the Agpro site, spent a great deal of time at the site, directly supervised his employees, and personally applied fertilizer and

pesticides to farm fields by operating a floater. This is exactly the type of "personal involvement" or "active participation," referred to in *C.J.R. Processing, Inc.*, required to hold a corporate officer individually liable under the Act. In addition, the trial court did specifically find that Schulte admitted in a July 1988 conversation with an IEPA inspector that *he* intentionally rinsed out the floaters on the gravel at the Agpro site. Accordingly, the trial court did not err in finding Schulte individually liable under the Act.

## III. CONCLUSION

For the foregoing reasons, we reverse that portion of the circuit court of Ogle County's judgment denying the State its post-July 1, 1996, remediation costs; and we remand the cause with directions. In all other respects, we affirm the judgment of the circuit court of Ogle County.

Affirmed in part and reversed in part; cause remanded with directions.

HUTCHINSON and GROMETER, JJ., concur.