# Illinois Official Reports

## Appellate Court

---

### *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2013 IL App (1st) 113498

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, Plaintiff-Appellee and Cross-Appellant, v. J.T. EINODER, INC., an Illinois Corporation, TRI-STATE INDUSTRIES, INC., an Illinois Corporation, JOHN EINODER, an Individual, and JANICE EINODER, an Individual, Defendants-Appellants and Cross-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3498 |
| Filed | December 11, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from defendants' operation of an unpermitted landfill, the trial court's subject matter jurisdiction was not affected by the Environmental Protection Agency's failure to notify defendants that they would be sued in their individual capacities, defendants' contention that a permit was not required for their operations was properly rejected, the evidence established that defendant wife participated in the alleged violations along with her husband, and the entry of a mandatory injunction requiring the removal of the above-grade waste and the penalties and fines were upheld, but the appellate court rejected the State's contention that defendants should have been ordered to take corrective action in the event groundwater contamination was discovered. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CH-10635; the Hon. Richard J. Billik, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Richard Prendergast and Seamus Prendergast, both of Richard J. Prendergast, Ltd., of Chicago, for appellants.

Lisa Madigan, Attorney General, of Chicago (Brett E. Legner, Assistant Attorney General, of counsel), for appellee.

Panel    PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Neville concurred in the judgment and opinion.
Justice Mason concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    Plaintiff-appellee and cross-appellant, the State of Illinois, filed a seven-count complaint against defendants-appellants and cross-appellees J.T. Einoder, Inc. (JTE), Tri-State Industries, Inc. (Tri-State), John Einoder (John), and Janice Einoder (Janice) (together, the Einoders), arising out of defendants' operation of an unpermitted landfill near Lynwood, Illinois. Following a bench trial, the court found in favor of the State on the first five counts, all of which generally alleged defendants had engaged in waste disposal or dumping operations above grade without a permit. The circuit court directed a verdict in favor of defendants on counts VI and VII, which alleged that defendants failed to properly notify and document the general construction and demolition debris accepted at the landfill and failed to perform a hazardous waste determination. The court ordered mandatory injunctive relief in the form of removal of the waste above grade and groundwater testing, and assessed fines of $500,000 each against John and JTE; $750,000 against Tri-State; and $50,000 against Janice, which was later reduced to $27,300 on reconsideration.

¶ 2    On appeal, defendants contend: (1) the Illinois Environmental Protection Agency's failure to give notice of its intent to pursue legal action against the Einoders in their individual capacities as required by sections 31(a)(1) and (b) of the Environmental Protection Act (Act) (415 ILCS 5/31(a)(1), (b) (West 2010)), deprived the court of subject matter jurisdiction; (2) no permit was required for the above-grade disposal of clean construction and demolition debris during the time the Lynwood site was operational; (3) the evidence was insufficient to find Janice personally liable for violations of the Act; (4) the court erred in entering a mandatory injunction ordering removal of the waste above grade; and (5) the penalties and fines assessed were unduly harsh.

¶ 3    The State cross-appeals on the ground that the circuit court erred when, in addition to periodic groundwater testing, it failed to order defendants to take corrective action in the event that contamination of groundwater is found. For the reasons that follow, we affirm the circuit court's order and reject the State's contention on cross-appeal.

¶ 4                                        BACKGROUND

¶ 5    The source of this controversy is a 90-foot hill located on a 40-acre site south of Lincoln Highway and east of Torrence Avenue in unincorporated Cook County near Lynwood, Illinois. From afar, the hill appears to be covered with vegetation and soil, but erosion gullies reveal that buried beneath this layer of greenery is construction and demolition debris (CDD).

¶ 6    CDD is a general term encompassing both *clean* construction and demolition debris (CCDD) as well as *general* construction demolition debris (GCDD). During the time the site was operational, CCDD referred to uncontaminated broken concrete without protruding metal bars, bricks, rock, stone, reclaimed asphalt pavement, or dirt or sand (later amended to soil) generated from construction or demolition activities (415 ILCS 5/3.78a (West 1998)), while GCDD included nonhazardous, uncontaminated materials resulting from construction, remodeling, repair and demolition activities, limited to such items as bricks, concrete, wood, and plaster (415 ILCS 5/3.78 (West 1998)).

¶ 7    The hill was formerly a sandpit that was purchased in 1993 and held in a land trust for the benefit of Tri-State, which is wholly owned and operated by its president, John. JTE, a closely held corporation, often leased equipment and operators to Tri-State for use at the site. During the relevant time period, Janice owned 90% of JTE and also served as its president, while John owned 10% and served as secretary.

¶ 8    The Lynwood site first came to the attention of the Illinois Environmental Protection Agency (Agency) in 1995, when the Agency received anonymous reports of open dumping. Gino Bruni, an environmental professional specialist for the Agency, testified that he first visited the site in December 1995 in response to these reports. At that time, he issued a citation for dumping without a permit. Similar citations followed his visits in 1996 and 1997.

¶ 9    In March 1996, JTE proposed to begin a recycling operation at the site. This recycling operation would entail receiving CDD at the site, separating and processing it, and returning the material to the economic mainstream. In response to JTE's proposal, Edwin Bakowski, the manager of the permit section for the Bureau of Land at the Agency, sent a letter to JTE to the attention of Janice in which he explained the circumstances under which a recycling facility could operate without a permit. He was concerned because JTE's proposal indicated it would accept nonrecyclable materials and he informed JTE that it could operate the facility without a permit only if it revised its proposal to accept solely CCDD. At the time, CCDD was defined as uncontaminated concrete, brick, stone, and reclaimed asphalt.

¶ 10   Several months later in June 1996, a hearing was held before the Cook County zoning board (Board) regarding JTE's application to operate a recycling facility for construction and demolition debris at the site. At the hearing, Janice testified to her experience in operating recycling facilities–three years–and also provided details as to the proposed hours of the

facility's operation, the number of employees, and the entities expected to deposit materials for recycling. The Board recommended that the application be granted, but there is conflicting evidence in the record as to the extent and duration of the facility's operation.

¶ 11 In the meantime, Bruni continued to return to the site for follow-up visits because the Agency remained concerned about the type of material the site was accepting. On March 25, 1998, Bruni had the opportunity to observe the site's operations from 7 a.m. to 12:30 p.m. That morning, 205 truckloads of construction and demolition debris were brought onto the site. Defendants generally charged between $25 to $40 per truckload of debris and between $75 to $150 for "hard to handle" loads. That morning, all but one load consisted of CCDD. The remaining load consisted of GCDD, which includes wood, drywall and scrap metal. A recycling machine known as the Eagle 1400 was located at the bottom of the sandpit, about 40 feet below ground. That machine was processing some GCDD. On that occasion, Bruni observed that the debris above grade covered an area 100 yards by 50 yards and was 5 yards deep.

¶ 12 Paul Purseglove, employed by the Agency as a field operations manager in the Bureau of Land, accompanied Bruni on his March 25 site visit. Purseglove spoke to John, who demonstrated the use of the Eagle 1400. While Purseglove was happy with John's plans for a recycling facility, he expressed concern with regard to the fill operation that was taking place. Purseglove observed that about 5 acres of the 40-acre pit had been filled with CCDD, and the pile was beginning to grow above grade. John reassured Purseglove that the material above grade would be compacted.

¶ 13 According to Purseglove, "grade" refers to the elevation of the ground in a specific area, expressed in terms of feet above mean sea level (MSL). At the site, grade was 631 MSL. Purseglove initially explained that while an amendment to the Act in 1997 exempted below-grade disposal of CCDD from permit requirements, in 1998 a permit was still required for CCDD disposed above grade. Somewhat contradictorily, Purseglove testified at trial that the permit for CCDD came into effect in 2005 or 2006. Later, he clarified:

> "[A]s of 2005, 2006 you are required to have a permit to put it [CCDD] below grade.
>
> Earlier on when this matter came to issue there was no permit required to put clean construction and demolition debris below-grade. But there has always been a requirement to have a permit when you start going above-grade. And that's one of the problems with this site, that Mr. Einoder went above-grade *** and did not have a permit to do that."

CDD, in contrast, requires a permit for disposal both above and below grade.

¶ 14 Following the March inspections, the Agency sent a violation notice to Tri-State to the attention of John and Janice on April 17, 1998. The notice generally alleged the dumping and disposal of waste without a permit as required by section 21 of the Act. 415 ILCS 5/21 (West 2010). Defendants responded with a remediation proposal, which the Agency rejected in July 1998.

¶ 15 On August 20, 1998, the Agency sent a notice of intent to pursue legal action to JTE addressed to the attention of John and Janice, based on charges that open dumping of waste

was occurring and waste disposal operations were being conducted without a permit in violation of the Act. The Agency had learned from one of Bruni's inspections that between January 1998 and May 11, 1998, 9,763 loads of waste had been deposited at the site.

¶ 16    Defendants successfully persuaded the Agency to dig 10 test pits at the site to determine the content of the material being used as fill before bringing suit. The digging occurred in November 1998 and the inspection followed one month later. The vast majority of the material unearthed was CCDD, with less than 0.1% of GCDD.

¶ 17    After sporadic inspections in 1999 and 2000 revealed a growing pile of CCDD above grade, the Illinois Attorney General eventually brought suit against Tri-State and JTE in July 2000. The complaint alleged that suit was brought by the Attorney General both on her own motion and at the request of the Agency. The complaint contained allegations of open dumping; conducting waste disposal operations without a permit; development and operation of a solid waste management site without a permit; disposal of waste at an unpermitted site; causing or allowing litter; failing to properly notify and document the GCDD accepted at the site and failing to limit percentage of nonrecyclable CDD; and failing to perform a hazardous waste determination.

¶ 18    Following the filing of the complaint, the State moved for a temporary restraining order and a preliminary injunction to halt the continued disposal of CCDD above grade. In April 2001, the court granted the motion in part and enjoined defendants from allowing open dumping of waste and conducting waste disposal operations that were not otherwise allowed as part of the recycling operation allegedly occurring at the site. Nevertheless, defendants continued to accept materials for disposal based on their belief that the term "grade" as used in the Act was vague and therefore, their conduct was not prohibited. In 2002, John revealed to Bruni that the site was receiving about 20 to 40 loads of CDD per day. It was not until sometime in 2003 that the site ceased operations, at which point Purseglove estimated that the site contained 48,000 truckloads of waste.

¶ 19    In 2005, the State amended its complaint to include the Einoders as defendants in their individual capacities, notwithstanding the fact that the Agency had never sent either John or Janice a notice of intent to take legal action. At trial, Ronald Schlossberg, an environmental investigator for the Illinois State Police who investigated criminal violations of the Act, testified that in his investigation of the Lynwood site, he learned that Janice was not involved in its "actual operation."

¶ 20    Janice likewise denied having any personal involvement at the site, testifying that she visited the Lynwood facility only 12 to 15 times in 10 years. During those visits, she would accompany John and she would usually wait in the car while he conducted business, though on some occasions she distributed paychecks or Christmas gifts to employees. Janice stated that John managed the daily operations through his company, Tri-State. With regard to JTE's involvement, Janice explained that it was limited to leasing equipment for use at the site to Tri-State, the owner of the property.

¶ 21    On cross-examination, Janice admitted that she executed 273 contracts on behalf of JTE for the recycling and disposal of material at the site between 1996 and 2002, but testified that she signed these forms at the suggestion of her insurance company to protect JTE from liability

if its equipment operators were injured. Janice also acknowledged that numerous letters and documents sent to the Agency listed JTE as the owner or operator of the site.

¶ 22 The circuit court ultimately found for the State on all counts related to disposal of waste and operation of a waste disposal site without a permit, but directed a verdict in favor of defendants on the issues of whether defendants failed to properly notify the Agency and document the GCDD accepted at the landfill and failed to perform a hazardous waste determination.

¶ 23 After the court ruled on liability, the parties proceeded to the remedies phase of the bifurcated trial. The State sought an injunction ordering defendants to remove the waste pile and undertake groundwater testing, and, in the event contamination of the groundwater was found, to take corrective action. In addition, the State asked for $5 million in fines against all defendants.

¶ 24 Defendants, through the testimony of their consulting engineer, John Lardner, maintained that capping the site would be a more environmentally sound remedy. Capping refers to the process of covering a landfill with clay, topsoil, and vegetation. Lardner explained that removal of the waste pile would require excavation and could take three to four years to complete. Additionally, the numerous truckloads of material that would need to be transported to other landfills would release pollution into the atmosphere. In contrast, capping would cause little disturbance to the land and would allow the site to be used by the community, perhaps as a sled hill.

¶ 25 After hearing additional testimony from Lynwood village leaders and the Einoders' son, the circuit court issued a 38-page written ruling granting the State's request for a mandatory injunction and ordered defendants to remove the above-grade waste pile and undertake groundwater testing. The court also imposed fines of $750,000 against Tri-State, $500,000 each against JTE and John, and $50,000 against Janice, later reduced to $27,300 on reconsideration. Defendants timely filed this appeal.

¶ 26                                                    ANALYSIS
¶ 27                                        Subject Matter Jurisdiction
¶ 28 We first address defendants' challenge to the trial court's subject matter jurisdiction, which is based on the Agency's failure to satisfy the notice requirements of sections 31(a)(1) and 31(b) of the Act with respect to John and Janice in their individual capacities. Because this issue presents a question of law, we exercise *de novo* review. *Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*, 2011 IL 111611, ¶ 26.

¶ 29 Section 31(b) provides:

> "*as a precondition to the Agency's referral or request to the Office of the Illinois Attorney General* or the State's Attorney of the county in which the alleged violation occurred for legal representation regarding an alleged violation *** the Agency shall issue and serve, by certified mail, upon the person complained against a written notice informing that person that the Agency intends to pursue legal action." (Emphasis added.) 415 ILCS 5/31(b) (West 2010).

It is undisputed that the Agency never sent notice to John and Janice in their individual capacities prior to naming them as defendants in their amended complaint filed on January 31, 2005. John and Janice filed a motion to dismiss the amended complaint, which was granted as to Janice. The State then filed a second amended complaint on August 4, 2005, again naming Janice as a defendant, which withstood another motion to dismiss. What is disputed is whether this notice requirement is jurisdictional. We hold that it is not.

¶ 30 Because our constitution provides that circuit courts have jurisdiction of all justiciable matters (Ill. Const. 1970, art. VI, § 9), courts do not have to depend on a statute for jurisdictional authorization (*Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 530 (2001)). Stated differently, since jurisdiction is conferred by the constitution, the legislature cannot, except in the area of administrative review, impose conditions precedent on the exercise of that jurisdiction by way of statute. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 335 (2002).

¶ 31 The cases on which defendants rely in support of their contention that the notice requirement is a jurisdictional prerequisite concern either review of an administrative agency's jurisdiction (*Illinois Power Co. v. Pollution Control Board*, 137 Ill. App. 3d 449 (1985); *Wabash & Lawrence Counties Taxpayers & Water Drinkers Ass'n v. Pollution Control Board*, 198 Ill. App. 3d 388 (1990)), or the circuit court's jurisdiction to review an administrative agency's decision (*Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202 (1985)), and as such, are inapposite. For example, in *Fredman Brothers*, the supreme court held that the timely filing of an appeal was essential to the circuit court's exercise of jurisdiction where the court was called on to review a decision of the Department of Revenue pursuant to the court's special statutory authority. *Fredman Brothers*, 109 Ill. 2d at 209-10. The same is not true here. The circuit court was not reviewing a decision of the Agency, but was exercising original jurisdiction over the controversy between the Agency and defendants. Accordingly, the failure of the Agency to comply with the statutory notice requirement did not deprive the court of subject matter jurisdiction and defendants' argument in this regard must fail. See *In re Custody of Sexton*, 84 Ill. 2d 312, 319-21 (1981).

¶ 32 Our decision also finds support in the distinction between directory and mandatory statutory provisions. A statutory provision is mandatory if the legislative intent was to impose a particular consequence for failing to comply with the provision. *People v. Borys*, 2013 IL App (1st) 111629, ¶ 24. Generally, a procedural command to a government official is presumed directory; however, this presumption may be overcome if: (1) there is negative language prohibiting further action in the case of noncompliance; or (2) the right the provision is designed to protect would generally be injured under a directory reading. *People v. Delvillar*, 235 Ill. 2d 507, 517 (2009).

¶ 33 Here, although section 31(b) uses the word "shall" (which often indicates a mandatory obligation (*Holly v. Montes*, 231 Ill. 2d 153, 160 (2008))), the statute does not prescribe any consequences resulting from the Agency's noncompliance with its provisions. Nor is the right of the party complained against necessarily injured by construing this section as directory. The purpose of the notice requirement, as defendants argue, is to permit parties facing Agency action for alleged violations of the Act to attempt to resolve those violations before the

commencement of suit. If parties like defendants fail to receive notice and were prejudiced by that failure, the Agency's failure to comply with section 31(b) could be raised as an affirmative defense. Given the extensive discussions before the filing of the lawsuit between the Agency, on the one hand, and JTE and Tri-State, through John and Janice, on the other, the likelihood that John and Janice could demonstrate prejudice resulting from the Agency's failure to give them notice is remote, at best.

¶ 34       Further, given the purpose behind the notice requirement, a defendant could certainly seek relief from the court in which the suit is pending directing the Agency to engage in that process before proceeding with the litigation. Here, however, the Einoders forfeited these avenues of relief by their failure to raise the lack of notice before trial. Because, at most, the Agency's failure to give notice to the Einoders could have been raised as an affirmative defense, the Agency's failure to give notice to the Einoders in their individual capacities had no effect on the trial court's subject matter jurisdiction.

¶ 35                                          Liability

¶ 36             *Defendants' claim that they were not required to obtain a permit*

¶ 37       Next, defendants contend that the statute as written between 1998 and 2003 did not require a permit for using CCDD as fill because such use did not constitute "waste." This presents a question of statutory interpretation, which we review *de novo*. *People v. Chapman*, 2012 IL 111896, ¶ 23.

¶ 38       Because the State's allegations are largely premised on defendants' alleged disposal of waste without a permit, if, as defendants maintain, the CCDD disposed of at the site did not constitute "waste," it follows that there can be no violation of the Act. The relevant provision of the Act as it existed during the time the violations occurred reads as follows:

> " 'Clean construction or demolition debris' means uncontaminated broken concrete without protruding metal bars, bricks, rock, stone, reclaimed asphalt pavement, or soil generated from construction or demolition activities. *** To the extent allowed by federal law, clean construction or demolition debris shall not be considered 'waste' when (i) used as fill materials *below grade* outside of a setback zone if covered by sufficient uncontaminated soil to support vegetation within 30 days of the completion of filling or if covered by a road or structure, or (ii) separated or processed and returned to the economic mainstream in the form of raw materials or products, provided it is not speculatively accumulated ***." (Emphasis added.) 415 ILCS 5/3.78a (West 1998).

¶ 39       On appeal, defendants do not dispute the circuit court's finding that over 700,000 cubic yards of CCDD at the site are above grade. Nevertheless, they ask us to ignore the plain statutory language exempting from a permit only CCDD that is used as fill *below* grade based on statements made by: (1) Edwin Bakowski, manager of the permit section for the Bureau of Land at the Agency; (2) Illinois State Representative Julie Hamos; and (3) Paul Purseglove, the Agency manager for field operations in the Bureau of Land. Examination of the evidence relied on by defendants does not support their position.

¶ 40    Turning first to Bakowski's statement, in his April 1996 letter to JTE addressed to the attention of Janice, he discussed JTE's proposed recycling operation at the Lynwood site. Bakowski described how facilities recycling only CCDD, ferrous and nonferrous metals, or harvested or untreated wood that is made into a commercial product do not require a permit. Significantly, this is in keeping with the statutory language exempting CCDD that is "separated or processed and returned to the economic mainstream in the form of raw materials or products" from the definition of waste for which a permit is required. See 415 ILCS 5/3.8a (West 2000).

¶ 41    Based on a review of JTE's recycling proposal, however, Bakowski determined that not all materials received at the site would be recyclable, and consequently, a permit application would be necessary. At the conclusion of the letter, Bakowski noted: "If you revise your planned activities to accept only clean construction or demolition debris, scrap metal or harvested or untreated wood, you will not be required to obtain a permit." When read in context, this latter statement does not support defendants' argument that Bakowski authorized them to continue CCDD fill operations without a permit. Rather, Bakowski's statement regarding unpermitted receipt of CCDD was limited to CCDD that would be recycled. While there was conflicting testimony regarding the extent, if any, to which CCDD received at the site was recycled, it is beyond dispute that the vast majority was not recycled, given that the pile of debris now stands nearly 90 feet above the surrounding elevation.

¶ 42    Representative Hamos's statements are likewise taken out of context. During the 2005 legislative session, Representative Hamos sponsored a bill proposing additional regulation of CCDD disposal. That bill, a form of which has since been enacted as section 22.51 of the Act (415 ILCS 5/22.51 (West 2010)), required a permit for CCDD used in fill operations. In explaining the purpose of this proposed legislation, Representative Hamos stated that as the law was then currently formulated, no application for a permit was required for CCDD fill. 94th Ill. Gen. Assem., House Proceedings, May 27, 2005, at 61 (statements of Representative Hamos).

¶ 43    Though defendants contend that Representative Hamos's remarks demonstrate that disposal of CCDD was wholly unregulated until 2005, this statement can reasonably be read to reflect Representative Hamos's understanding that CCDD disposed below grade was exempt from permit requirements and the bill was intended to close this loophole. This reading is supported by subsection 22.51(d) of the Act itself (415 ILCS 5/22.51(d) (West 2010)), which states that this section "applies only to clean construction or demolition debris that is *not* considered 'waste' as provided in Section 3.160 of this Act." (Emphasis added.) (Section 3.160 is the current section 3.78a.) This is an implicit recognition that some CCDD–*i.e.*, that disposed of above grade or not accepted for purposes of recycling–*is* considered waste and was already subject to regulation.

¶ 44    Finally, defendants rely heavily on the following question and answer during Paul Purseglove's cross-examination:

>       "Q. And the permit for clean construction and demolition debris came into being in 1997, 1998 when we changed the definition for what clean construction and demolition debris was?

A. The permit for clean construction and demolition debris came into effect in 2005 or 2006."

We are not inclined to place great weight on this isolated response where the balance of Purseglove's testimony reflected his understanding that the Act required a permit to dispose of CCDD above grade during the time the site was operational. Indeed, on further cross-examination, he clarified that while the 2005 or 2006 amendment to the Act required a permit to dispose of CCDD below grade, "there has always been a requirement to have a permit when you start going above-grade."

¶ 45    In any event, stripping the statements of Bakowski, Representative Hamos and Purseglove of context and taking them at face value would not compel us to accept defendants' argument. Offhand statements by legislators and Agency employees cannot trump the language of a statute where the language is clear on its face. See *Brucker v. Mercola*, 227 Ill. 2d 502, 513 (2007) (noting that it is unnecessary to resort to other aids of construction where statutory language is unambiguous). From 1998 to 2003, the Act explicitly stated that *only* CCDD (1) used as fill below grade or (2) recycled and returned to the economic mainstream was exempt from the definition of waste and, therefore, exempt from permitting requirements. Because from 1998 to 2003 virtually all the CCDD transported to the site was disposed of above grade and was not recycled, and because such material was included in the definition of waste under the Act, we reject defendants' argument that they were not required to obtain a permit for the operation.

¶ 46                                      *Janice's individual liability*

¶ 47    Defendants next challenge the circuit court's determination that Janice was liable for violations of the Act in her individual capacity. We have previously held that corporate officers are "persons" under the Act and thus may be subject to liability for violations of the Act. *People ex rel. Burris v. C.J.R. Processing, Inc.*, 269 Ill. App. 3d 1013, 1016 (1995); see also 415 ILCS 5/3.315 (West 2010) (defining "person," in relevant part, as "any individual"). But this liability is limited to officers who have personal involvement or participate actively in violations of the Act. *C.J.R. Processing*, 269 Ill. App. 3d at 1018. Therefore, more is required than merely establishing the corporate officer had a management position or general corporate authority (*People ex rel. Madigan v. Tang*, 346 Ill. App. 3d 277, 289 (2004)); however, it is not necessary to show that the officer actually performed the physical act that constituted a violation (*People ex rel. Ryan v. Agpro, Inc.*, 345 Ill. App. 3d 1011, 1028 (2004)).

¶ 48    A trial court's decision as to corporate officer liability will not be reversed unless it is manifestly erroneous. *People ex rel. Madigan v. Petco Petroleum Corp.*, 363 Ill. App. 3d 613, 623 (2006). Manifest error is that which is clearly evident, plain, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). As always, the circuit court, as the trier of fact, was in a superior position to judge the credibility of witnesses and determine the weight to be given to their testimony. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). We will uphold credibility determinations unless they are against the manifest weight of the evidence. *In re Christopher K.*, 217 Ill. 2d 348, 373 (2005).

¶ 49       The evidence at trial went beyond a showing that Janice had general corporate authority. The State introduced over 200 contracts signed by Janice that authorized various companies and individuals to deposit construction material, broken concrete and asphalt, dirt, clay, bricks, rocks and stone at the site. While Janice testified that she entered into these contracts only for insurance purposes, the trial court was free to disbelieve that testimony in light of the plain language of the contracts, which set forth the materials that would be accepted at the site and the terms under which the acceptance would occur. Janice continued to sign these contracts even after she admitted to receiving violation notices from the Agency and after suit was filed.

¶ 50       Moreover, as the president and 90% owner of JTE, it was reasonable for the court to conclude that Janice was not merely effectuating a corporate decision in signing the contracts, but instead played a substantial role in making that decision. This is particularly true in light of Janice's testimony that she was heavily involved in the day-to-day operations of JTE. Again, although Janice denied JTE's involvement at the site beyond merely renting equipment to Tri-State, it was not contrary to the manifest weight of the evidence for the trial court to conclude otherwise. There was evidence that in communications with the Agency, Janice referred to JTE as the "operator" of the site; several letters from the Agency regarding violations at the site were addressed to JTE and Janice's attention; and Janice testified at a hearing on behalf of JTE before the Cook County zoning board regarding permission to operate the site as a recycling facility. All of these facts support the trial court's determination that notwithstanding Janice's attempt to minimize her involvement in the operation of the landfill, she was sufficiently involved to warrant holding her personally liable for the violations of the Act committed by JTE.

¶ 51       Janice's conduct is not unlike that of the individual defendants in *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir. 1986), which the court in *C.J.R. Processing* cited as an example of the appropriate imposition of personal liability under the Act. In *Northeastern Pharmaceutical*, a corporate officer was found to have violated the federal Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6973 (Supp. 1986)) in his individual capacity where he personally arranged for the transportation and disposal of hazardous substances. *Northeastern Pharmaceutical*, 810 F.2d at 745-46. Likewise, Janice's conduct in signing literally hundreds of contracts constituted an arrangement for and the authorization of disposal of debris above grade, which is precisely the violation of the Act charged by the State. Under these circumstances, we cannot say the circuit court's determination as to her personal liability was manifestly erroneous.

¶ 52       The testimony of Ronald Schlossberg, an environmental investigator for the Illinois State Police who investigated the site to determine if there had been criminal violations of the Act, does not compel a different conclusion. On cross-examination, Schlossberg was asked if he became aware early in his investigation that Janice "was not involved in the actual operation at the landfill," and he responded affirmatively. Defendants did not probe Schlossberg on this point, and thus we do not know what Schlossberg believed constituted "actual operation." Nor do we know to what extent Schlossberg investigated Janice in connection with violations at the site. It is unclear, for example, whether at the time he reached this conclusion, Schlossberg was aware of the hundreds of contracts executed by Janice authorizing the transportation of waste

to the site, her representations to the Agency that JTE "operated" the site, and her testimony before the Cook County zoning board seeking authorization to operate the site as a recycling facility. The circuit court was not required to accept Janice's testimony regarding her involvement in the operations at the site over the other evidence that Janice participated in violations of the Act.

¶ 53                                    Remedies
¶ 54                          *Mandatory injunctive relief*
¶ 55       Having affirmed the court's holding with regard to liability, we next consider defendants' arguments regarding the remedies imposed. To reiterate, defendants' conduct giving rise to the State's claim for mandatory injunctive relief occurred (and ceased) before the effective date of the amendment of section 42(e). Initially, defendants challenge the court's decision to order mandatory injunctive relief in the form of removal of the above-grade CCDD at the site. Defendants maintain that at the time of the violations, section 42(e) of the Act did not authorize mandatory injunctive relief. See *People ex rel. Ryan v. Agpro, Inc.*, 214 Ill. 2d 222, 234 (2005) (holding that under pre-2004 Act, defendants could not be ordered to take affirmative action to clean Agpro site where section 42(e) did not authorize imposition of mandatory injunction). The State acknowledges *Agpro*, but correctly points out that the version of section 42(e) at issue in *Agpro* was amended in response to the appellate court's decision in *Agpro*, 214 Ill. 2d at 229-30. Thus, in *Agpro,* the legislature enacted the amendment after the case achieved finality but while still on appeal. And it is the amendment, not the earlier version, that is applicable here.

¶ 56       Until 2004, section 42(e) read as follows: "The State's Attorney of the county in which the violation occurred, or the Attorney General, may *** institute a civil action for an injunction to restrain violations of this Act." 415 ILCS 5/42(e) (West 2002). Following an amendment effective July 28, 2004, the section now reads:

> "The State's Attorney of the county in which the violation occurred, or the Attorney general, may *** institute a civil action for an injunction, *prohibitory or mandatory*, to restrain violations of this Act *** *or to require such other actions as may be necessary to address violations of this Act,* any rule or regulation adopted under this Act, any permit or term or condition of a permit, or any Board order." (Emphases added.) 415 ILCS 5/42(e) (West 2010).

Since neither party disputes that mandatory injunctions were not available under the former section 42(e) but authorized under the latter, the only issue for resolution is whether the 2004 amendment may be applied retroactively. As this is an issue of statutory interpretation, our review is *de novo*. *People v. Chapman*, 2012 IL 111896, ¶ 23.

¶ 57       When considering the retroactive application of a statutory amendment, the first step is to determine whether the legislature indicated the temporal reach of the amendment. *Caveney v. Bower*, 207 Ill. 2d 82, 91 (2003). Our supreme court has explained that if the legislature did not expressly indicate its intent in the text of the amended statute itself, then we must turn to section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2010)), which is "the general saving

clause of Illinois." *People v. Glisson*, 202 Ill. 2d 499, 505 (2002). By way of this statute, the legislature has indicated the temporal reach of every statutory amendment, and we need never proceed beyond step one in our analysis. *Caveney*, 207 Ill. 2d at 92. We would reach step two only if the legislature did *not* make its intentions regarding retroactive application clear, in which case the issue becomes whether applying the statute would have a retroactive impact. *Id.* at 91.

¶ 58 The amendment to section 42(e) does not expressly state that it applies to all cases pending on or before its effective date. That the Act "takes effect upon becoming law" (Pub. Act 93-831 (eff. July 28, 2004)) is not a sufficient expression of legislative intent that the statute should be applied retroactively. But that does not end our inquiry.

¶ 59 Several provisions of the Act indicate that the legislature intended for the penalty provisions to be applied retroactively. Most significant is section 2(b). This provision, which states the Act's purpose, focuses on the past. As set out in section 2(b), the Act is designed to "*restore*, protect and enhance the quality of the environment, and to assure that *adverse effects* upon the environment are fully considered and *borne by those who cause them*." (Emphases added.) 415 ILCS 5/2(b) (West 2010). Furthermore, section 2(c) specifies that the Act "shall be liberally construed" to fulfill its purposes. 415 ILCS 5/2(c) (West 2010). One way to "restore" the property where defendants illegally dumped solid waste is to remove the above-grade waste material from the site and conduct groundwater testing. The Act expressly requires that the party that caused the adverse effects must pay the restoration costs.

¶ 60 This was the reasoning of the Second District in *State Oil Co. v. People*, 352 Ill. App. 3d 813 (2004), which is persuasive here. In *State Oil*, the Second District found that a provision in the Act making owners of underground storage tanks liable for costs associated with remediating pollution discharged from those tanks can be applied retroactively. *Id.* at 819. The Second District relied on one of the general purposes of the Act, as expressed in section 2(b), to "restore the environment." The court also relied on the Act's mandate for liberal judicial construction to accomplish its purpose. 415 ILCS 5/2(c) (West 2010). The court stated that "it is clear that the legislature intended the Act to address ongoing problems, which by definition existed at the time that the Act was enacted." *State Oil*, 352 Ill. App. 3d at 819. Similarly, here, the legislature's intent–that sites adversely affected by illegal waste disposal be restored–can only be effectuated by requiring defendants to remove the waste.

¶ 61 Simply allowing defendants to pay a fine without cleaning the affected site ignores a key purpose of the Act. Further, failing to permit a trial court to order a defendant that has engaged in illegal waste disposal to restore the property would, in effect, nullify the language of section 2(b) of the Act. See *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001) (court must avoid "an interpretation which would render any portion of the statute meaningless").

¶ 62 The dissent takes issue with our reliance on section 2(b) and *State Oil Co.,* contending that the language "does not shed any light on whether the legislature intended a change in the law enacted decades later to apply retroactively." *Infra* ¶ 89. But that misstates the nature of the legislative intent at issue. An act's preamble "has long been recognized as one of the quintessential sources of legislative intent." *Atkins v. Deere & Co.*, 177 Ill. 2d 222, 232 (1997), and the legislature in the 2004 amendment does not touch one word of section 2(b). Thus,

- 13 -

instead of shedding no light, the preamble remains the best indicator of the legislature's intent. The alternative would be to ignore any policies in a statute that preceded its amendment merely because some part of the statute was subsequently amended. This turns legislative intent on its head.

¶ 63　Aside from the language and purpose of the Act itself, case law supports a finding that remedial provisions–section 42(e) is a remedial provision which varies the relief that may be imposed for violating the Act–should be applied retroactively. This court has held that "statutes and amendatory acts are presumed to operate prospectively unless the statutory language is so clear as to admit of no other construction. [Citations.] [An exception] to this general rule is that statutes or amendments which relate only to remedies or forms of procedure are given retrospective application." (Internal quotation marks omitted.) *Shoreline Towers Condominium Ass'n v. Gassman*, 404 Ill. App. 3d 1013, 1023 (2010). See also *In re Marriage of Duggan*, 376 Ill. App. 3d 725, 729 (2007) ("If an amendatory act merely affects the remedy or law of procedure, all rights of action will be enforceable under the new procedure even if they accrued prior to the change of law and the action was instituted prior to the amendment ***." (Internal quotation marks omitted.)). While this exception does not apply where a party has a vested right at stake, as the State properly takes note, defendants have no vested right in illegally dumping waste or in a particular remedy or procedure after they have been found liable for doing so.

¶ 64　The dissent contends section 42(e) is a substantive provision rather than procedural or remedial, because, the section, as amended, imposes a new liability on defendants by allowing the State to seek injunctive relief where previously it could only do so in certain exigent circumstances. For support the dissent cites to two cases dating from the 1950s, *Dworak v. Tempel*, 17 Ill. 2d 181 (1959), and *Theodosis v. Keeshin Motor Express Co.*, 341 Ill. App. 8 (1950), cases in which retroactive application would either divest or affect vested rights or impair the obligation of a contract in actions involving private rather than public rights. But, no "vested right" is involved here. See *In re Marriage of Duggan*, 376 Ill. App. 3d at 729 (A "vested right" has to be "sufficiently well established to be protected under the due process clause of the constitution."); *Keystone Service Co. v. 5040-60 North Marine Drive Condominium Ass'n*, 153 Ill. App. 3d 220, 223 (1987). And no private right is involved either.

¶ 65　A retroactive law has been defined as one that takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed. *Griffin v. City of North Chicago*, 112 Ill. App. 3d 901, 904-05 (1983). Section 42(e) does not divest or affect vested rights, impair the obligation of a contract, or violate the due process clause. The critical point is that defendants did not have a vested right to engage in dumping solid waste on the property without a permit. Because no vested right has been affected, the application of the amended section 42(e) is proper, irrespective of when the cause of action accrued or the complaint was filed.

¶ 66　The mandatory injunctive relief, under the amendment, altered solely the applicable remedial standards. An injunction is only a remedy for an underlying cause of action and is not a cause of action in itself. See *Town of Cicero v. Metropolitan Water Reclamation District of*

*Greater Chicago*, 2012 IL App (1st) 112164, ¶ 46 (permanent injunction is an equitable remedy, not a separate cause of action). There is no "injunctive" cause of action under Illinois law, or, for that matter, federal law. Whether or not the injunction issues depends entirely on the plaintiff prevailing at trial on the merits of its claim. *Cicero*, 2012 IL App (1st) 112164, ¶ 46 (citing *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 431 (2004)). In other words, the injunction is limited to procedural relief only, and not any substantive outcome.

¶ 67   The dissent believes requiring the hill's removal now to be "clearly" unnecessary. Whether removal is or is not a necessary remedy is well within the discretion of the trial court, sitting in equity, to fashion as it deems necessary and appropriate under the circumstances.

¶ 68   Therefore, we conclude that the court could order removal of the waste pile at the site, as mandatory injunctive relief was available under the statute. The court also granted mandatory injunctive relief in the form of ordering defendants to undertake testing of the groundwater below the site, but this portion of the court's order is not challenged on appeal and is therefore not subject to our review. For this same reason, we reject the State's contention on cross-appeal that the circuit court erred in failing to order defendants to take corrective active action if groundwater testing revealed contamination.

¶ 69                                          *Amount of fines*

¶ 70   The only remaining issue concerns the fines imposed by the circuit court. Under section 42(a) of the Act, a court is authorized to impose a maximum penalty of $50,000 for a violation of the Act and an additional penalty of $10,000 for each day the violation continues. 415 ILCS 5/42(a) (West 2010). The court has broad discretion when imposing civil penalties under this section, and we will not disturb the court's decision unless it is clearly arbitrary, capricious or unreasonable. *People ex rel. Ryan v. McHenry Shores Water Co.*, 295 Ill. App. 3d 628, 638 (1998) (citing *ESG Watts, Inc. v. Pollution Control Board*, 282 Ill. App. 3d 43, 50-51 (1996)).

¶ 71   In exercising its discretion, the court may consider: (1) the duration and gravity of the violation; (2) the defendant's due diligence in attempting to comply with the Act's requirements; (3) economic benefits the defendant received by delaying compliance; (4) the monetary penalty that would deter the defendant from committing additional violations and would aid in enhancing voluntary compliance by those similarly situated; (5) the number, proximity in time and gravity of any previously adjudicated violations; (6) whether the defendant self-disclosed its noncompliance to the Agency; and/or (7) whether the defendant has agreed to undertake a "supplemental environmental project." 415 ILCS 5/42(h) (West 2010). Here, the court referred generally to section 42(h) prior to issuing its remedies ruling.

¶ 72   Defendants initially contend the fines imposed were "unprecedented" and "unduly harsh" in light of the lack of clear regulations for disposal and storage of CCDD. Because, as we have already concluded, the disposal of the materials deposited at the site was clearly regulated under the Act before the time operations commenced, we again reject this argument as a basis for overturning the fine imposed by the trial court. We also have already addressed and rejected defendants' argument, repeated here, that there was insufficient evidence to hold Janice personally liable for the violations charged. We again reject those arguments as a basis for reversing the fines against her.

¶ 73    Defendants also contend that the record is devoid of evidence demonstrating that they derived an economic benefit as a result of their failure to comply with the Act. We disagree. As the circuit court noted, there is evidence that the site received over 9,700 loads of CCDD in the period between January and May 1998. At a rate of between $25 to $40 a load, at a minimum, defendants generated revenues of $242,500 in less than six months. Other evidence revealed that the site contained roughly 721,000 cubic yards of waste above grade. John Lardner testified that a truckload could contain 13 cubic yards of material, which amounts to over 55,000 truckloads deposited at the site between 1998 and 2003, when operations ceased. Purseglove made the more conservative estimate that the site contained 48,000 truckloads of material, resulting in gross profits for defendants between $1.2 million and $1.9 million. This does not take into account the higher rates of between $75 to $150 that defendants charged for "hard to handle fill." Certainly, these calculations could reasonably allow the court to conclude that defendants obtained a substantial economic benefit from operating the unpermitted landfill, particularly where defendants never contended or presented evidence that the site was a money-losing operation. *Contra Central Illinois Light Co. v. Pollution Control Board*, 17 Ill. App. 3d 699, 702-03 (1974) (pointing to lack of basis for a penalty as further evidence that lower court erred in finding violation of Act).

¶ 74    Although defendants fault the State for failing to present evidence regarding the net profits generated by operations at the site, there is no requirement under the Act that penalties imposed bear a mathematical relationship to the net profits realized by virtue of the violations charged. Indeed, this approach could encourage potential violators to simply factor in the estimated penalty to the cost of doing business, thus defeating the dual purpose of the imposition of penalties, which is to punish violators and discourage other similarly situated parties from engaging in prohibited conduct. If defendants wanted the trial court to consider evidence that net profits were substantially less than the reasonable estimate of gross profits provided by the State, nothing precluded defendants from presenting that evidence, which was readily available to them.

¶ 75    Further, it appears that at least in one important respect, Tri-State's cost of doing business–the rental of equipment and operators used in its operations–should not under any circumstances have been factored in to the determination of an appropriate penalty. The equipment and operators used by Tri-State were leased from JTE, which, as noted, was entirely owned by John and Janice. Thus, because the rental payments were not made to a disinterested third party, but to an entity likewise charged with violating the Act and wholly owned by the individual defendants, the court could properly have refused to reduce the profits realized by defendants to account for this cost.

¶ 76    Even assuming that this estimation of gross profits, standing alone, was too speculative to support the trial court's fines, we nevertheless cannot conclude that the civil penalties imposed were arbitrary, capricious, or unreasonable. Importantly, economic benefit is only one of many factors a trier of fact may look to when imposing fines. The other considerations, such as deterrence, self-disclosure of violations, and the duration of violations, do not have an easily calculable monetary value. The trial court could properly have reasoned that defendants' continued operations for five years after receiving violation notices from the Agency

necessitated particularly severe penalties in order to deter future violators from engaging in similar conduct.

¶ 77    Finally, defendants' argument for a reduction in penalties due to their lack of awareness regarding permit requirements is disingenuous given the evidence adduced at trial. Purseglove testified that as early as March 1998, he informed John during a site visit that a permit was required to deposit fill material above grade. Bruni also cautioned John when he noticed above-grade deposits. Then, in April 1998, the Agency sent its first violation notice to Tri-State. Thus, if defendants initially believed a permit was not necessary, by 1998 they certainly knew that the Agency did not agree with them. Yet despite this knowledge, they continued operations at the site for the next five years, including three years following the filing of the State's lawsuit in July 2000. Indeed, there is evidence that in 2002, well after suit was filed, the site received as many as 20 to 40 loads of CDD per day. These facts do not reflect "due diligence" in attempting to comply with the Act's requirements. To the contrary, they are indicative of flagrant violations of the Act, distinguishing defendants' conduct from that of other violators who were assessed comparatively lesser penalties. See, *e.g.*, *Standard Scrap Metal Co. v. Pollution Control Board*, 142 Ill. App. 3d 655, 662 (1986) (defendant violator applied for and was granted a permit after suit was filed against it); *McHenry Shores*, 295 Ill. App. 3d at 631 (after receiving enforcement letter from Agency, defendant made some attempt to remedy violations). Accordingly, we do not find the court's decision to impose fines against each defendant or the amount of those fines to be an abuse of discretion.

¶ 78                                    CONCLUSION

¶ 79    For the reasons stated, we affirm the trial court's findings with regard to liability, the imposition of a civil penalty in the form of fines, and entry of the mandatory injunction ordering defendants to undertake removal of the waste. We further affirm the trial court's denial of the additional mandatory injunctive relief requested by the State in its counter-appeal.

¶ 80    Affirmed.

¶ 81    JUSTICE MASON, concurring in part and dissenting in part.

¶ 82    With the exception of the mandatory injunctive relief granted by the trial court, I agree that the trial court's judgment should be affirmed. However, I disagree with the majority's conclusion that the 2004 amendment to section 42(e) of the Act may be applied retroactively to authorize the mandatory injunction ordered by the trial court and, for that reason, I respectfully dissent.

¶ 83    As the majority acknowledges, defendants' operation of the Lynwood site ceased prior to the July 24, 2004 effective date of the amendment to section 42(e). The majority also recognizes our supreme court's decision in *Agpro*, in which the court determined that "the recent amendment [of section 42(e)] is not a retrospective 'clarification' of existing law, but is instead *a change in the law*." (Emphasis added.) *People ex rel. Ryan v. Agpro, Inc.*, 214 Ill. 2d 222, 230 (2005). Yet, despite the *Agpro* court's recognition that prior to its amendment, section

- 17 -

42(e) did not authorize a court to impose mandatory injunctive relief requiring a party violating the Act to remedy any harm to the environment, the majority concludes that the amendment may, indeed, be applied retroactively in this case because (1) the legislature has indicated that the amendment should be applied retroactively to enforce the "remedial" purposes of the Act and (2) the amendment is "procedural," rather than "substantive." Because I conclude that there is no expression of legislative intent that the amendment be applied retroactively and retroactive application improperly imposes new liabilities for past conduct, I would reverse the mandatory injunction granted by the trial court.

¶ 84 Our supreme court's decision in *Caveney v. Bower,* 207 Ill. 2d 82 (2003), dictates the steps we must follow in determining whether the amendment to section 42(e) should be applied retroactively. The first question is whether the legislature has clearly indicated the temporal reach of the amendment. If so, the intent of the legislature should be given effect, "absent a constitutional prohibition." *Id.* at 91. If there is no clear expression of legislative intent, "then the court must determine whether applying the statute would have a retroactive impact, *i.e.*, whether it would impair rights a party possessed when he acted, *increase a party's liability for past conduct*, or impose new duties with respect to transactions already completed." (Emphasis added.) *Id.*

¶ 85 As to the first inquiry, the majority concedes that Public Act 93-381–the Act amending section 42(e)–contains no clear expression of legislative intent in that it simply provides that the amendment "takes effect upon becoming law." Pub. Act 93-381 (eff. July 28, 2004). See *Foster Wheeler Energy Corp. v. LSP Equipment, LLC*, 346 Ill. App. 3d 753, 760 (2004) (considering identical language in section 99 of the Building and Construction Contract Act (815 ILCS 665/99 (West 2002))). Ordinarily, where courts have construed a statute to apply retroactively, the language has been explicit. For example, in *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 41-42 (2001), the supreme court considered amendments to the Counties Code (55 ILCS 5/5-1024 (West 1994)), and the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/9-107 (West 1994)), both of which stated that the amendments' validation of taxes "applies to all cases pending on or after the effective date of this amendatory Act of 1994." (Internal quotation marks omitted.) The amendment to the Tort Immunity Act also validated levies adopted "either before, on or after the effective date of [the Act]." (Internal quotation marks omitted.) *Commonwealth Edison*, 196 Ill. 2d at 42. The court termed this language "an unequivocal expression of legislative intent" that the amendments should apply to validate levies enacted prior to the amendments' effective date. *Id.*

¶ 86 But notwithstanding that the amendment itself contains no clear expression of its temporal reach, the majority concludes that other provisions of the Act, specifically sections 2(b) and 2(c) (415 ILCS 5/2(b), (c) (West 2010)), clearly express a legislative intent that the Act's "penalty provisions" be applied retroactively. Citing section 2(b), the majority relies on the Act's "remedial" nature and concludes that the amendment to section 42(e) must be given retroactive effect because such a result fosters the Act's stated purposes to "restore" the environment and impose liability for "adverse effects" on the environment on those who cause them and is further consistent with section 2(c)'s direction that the Act be "liberally

- 18 -

construed." Without the retroactive application of amended section 42(e) to compel defendants to "clean up" the Lynwood site, the majority reasons that the Act's salutary purposes will be frustrated.

¶ 87    As a threshold matter, the "remedial" nature of any legislation is not a stand-alone basis upon which to gauge its retroactive effect. Were that the case, courts would deem most legislative enactments retroactive because the vast majority of legislation is designed to remedy a problem to which the new or amended law is addressed.

¶ 88    That aside, the preference for the prospective application of statutes "has existed from time out of mind." *Rivard v. Chicago Fire Fighters Union, Local No. 2*, 122 Ill. 2d 303, 308 (1988). This preference is founded upon " '[the] fundamental principle of jurisprudence that retroactive application of new laws is usually unfair.' " *Id.* at 309 (quoting 2 Norman J. Singer, Sutherland on Statutory Construction § 41.02, at 340 (Sands 4th ed. 1986)). Therefore, the general rule of construction is that an amendatory act will be construed as prospective in its application. *Rivard*, 122 Ill. 2d at 309.

¶ 89    The majority's focus on the Act's remedial nature is precisely the justification rejected by the *Agpro* court for a "broad" interpretation of the Act to allow for mandatory injunctions. *Agpro*, 214 Ill. 2d at 234 ("The State argues the purposes of the Act are better served when polluters can be ordered to clean up even in nonemergency situations. However, because the language of section 42(e) is plain and unambiguous, we cannot consider the State's policy arguments."). Section 2(b)'s language regarding the Act's purposes and section 2(c)'s direction that the Act be liberally construed have been a part of the Act since it was passed in 1970. This original statement of purpose–extant more than 30 years at the time section 42(e) was amended in 2004–does not shed any light on whether the legislature intended a change in the law enacted decades later to apply retroactively. This is why the reasoning of *State Oil Co. v. People*, 352 Ill. App. 3d 813 (2004), upon which the majority relies, is unpersuasive.

¶ 90    Given the lack of any unequivocal expression of legislative intent, under *Caveney*, the inquiry then turns to whether the amendment to section 42(e) will have a retroactive impact. In order to resolve this question, *Caveney* directs us to the general savings clause in section 4 of the Statute on Statutes for clarification regarding the legislature's intent. Section 4 provides:

> "*No new law shall be construed to repeal a former law*, whether such former law is expressly repealed or not, *as to any offense committed against the former law*, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, *or in any way whatever to affect any such offense or act so committed or done*, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising *before the new law takes effect*, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding." (Emphases added.) 5 ILCS 70/4 (West 2010).

*Caveney* concluded that this is a "clear legislative directive" with regard to the temporal reach of statutory amendments: "those that are procedural in nature may be applied retroactively, while those that are substantive may not." *Caveney*, 207 Ill. 2d at 92. Thus, if the amendment is determined to have a retroactive effect, *i.e.*, if it affects substantive rights or obligations, "the court must presume that the legislature did not intend" that the amendment be applied

retroactively. 207 Ill. 2d at 91. An example of an amendment that is substantive in nature is one that imposes a new liability on a defendant. *Dworak v. Tempel*, 17 Ill. 2d 181, 187 (1959); see *Theodosis v. Keeshin Motor Express Co.*, 341 Ill. App. 8, 25 (1950) (holding that a statutory amendment increasing the limits on recovery under the Injuries Act of 1947 from $10,000 to $15,000 was substantive and could not be applied retroactively).

¶ 91　　On this point, the majority concludes that because the amendment relates only to "remedies or forms of procedure," it is a procedural change in the law that may properly be given retroactive effect. *Supra* ¶ 63. To reach this conclusion, the majority engages in a "vested rights" analysis and posits that since defendants had no vested right to engage in dumping solid waste without a permit, there is no reason to refrain from giving the amendment to section 42(e) retroactive effect. And if the vested rights doctrine was the only framework for analyzing the temporal reach of the amendment to section 42(e), the majority would be correct.

¶ 92　　But the majority overlooks another basis for determining that the retroactive application of an amended law is impermissible, *i.e.*, whether such application will increase a party's liability for past conduct. *Caveney*, 207 Ill. 2d at 91. In the context of this case, a finding that a court can, via a mandatory injunction, require defendants to remove the waste deposited at the site clearly exposes defendants to greater and more onerous liabilities than was the case in 2003 when their violations of the Act ceased. Prior to 2004, the State had no right to seek mandatory injunctive relief to require the cleanup of waste dumped without a permit. *Agpro* establishes this beyond question. *Agpro* also outlines the pre-amendment methods available to the State: "[I]n emergencies a polluter may be ordered to clean up. *In all other circumstances, the State may clean up and send the polluter the bill.* In any case, [the] polluter may prefer to clean up voluntarily so as to control the costs." (Emphasis added.) *Agpro*, 214 Ill. 2d at 233-34. The retroactive application of the amendment to section 42(e) substantively alters this remedial scheme by allowing the State to bypass the interim decision as to whether remediation of the site is warranted so that it will conduct the clean up itself and instead permits the State to impose that obligation directly upon defendants. Therefore, the amendment's retroactive application in the context of this case is impermissible.

¶ 93　　This last point is particularly significant here given that, unlike many environmental cases, the waste at issue in this case is uncontaminated and nonhazardous to the environment. Photographs of the site in the record show that, over time, trees and vegetation have covered the hill. Without retroactive application of the amendment to section 42(e), it is inconceivable that the State would prioritize the expenditure of scarce resources to "clean up" a site that, in its present state, poses no threat to the environment. Thus, because it is unlikely that the State would expend the funds necessary to remediate nonhazardous waste, defendants would, in turn, receive no "bill" from the State for the expense. This is especially true given the fact that defendants have an ongoing obligation to monitor the groundwater at and around the site, relief that they have not challenged on appeal. If and when the effects of that monitoring show any ill effects on the surrounding environment, nothing would prevent the State from seeking to require defendants, under amended section 42(e), to remediate those conditions at that time.

¶ 94　　The majority maintains that removal of the hill is the only way to satisfy the Act's goal of "restoring" the environment. I disagree. If defendants had spewed toxins into the earth that had

- 20 -

migrated into groundwater, I would agree with the conclusion, despite the legal unavailability of the remedy. But the Agency does issue permits for landfills receiving CCDD. There is no evidence in the record that the Agency would have refused to issue a permit to defendants. The Agency does allow permitted landfills to accumulate CCDD above grade. And the Agency does allow landfill operators who cease operations to take precautions, such as capping, to prevent any minor amounts of contaminants from migrating offsite. Given that the evidence in the record shows the presence of a minuscule amount (less than 0.1%) of potential contaminants in the material deposited at the site, the requirement that the entirety of the hill be removed is clearly not necessary.

¶ 95       For all of the foregoing reasons, I would reverse that aspect of the trial court's judgment awarding the State mandatory injunctive relief.